Slip Op. 16-93

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **SUNPREME INC.,** | |
| **Plaintiff,** | |
| **v.** | **Before: Claire R. Kelly, Judge** |
| **UNITED STATES,** | **Court No. 16-00171** |
| **Defendant,** | **PUBLIC VERSION** |
| **and** | |
| **SOLARWORLD AMERICAS, INC.,** | |
| **Defendant-Intervenor.** | |

## OPINION AND ORDER

[Denying Plaintiff's motion for a preliminary injunction in part and granting in part.]

Dated: October 5, 2016

<u>John Marshall Gurley</u>, <u>Diana Dimitriuc-Quaia</u>, and <u>Nancy Aileen Noonan</u>, Arent Fox LLP, of Washington, DC, for plaintiff.

<u>Justin Reinhart Miller</u>, Senior Trial Counsel, International Trade Field Office, Civil Division, U.S. Department of Justice, of New York, NY, for defendant.  With him on the brief were <u>Tara Kathleen Hogan</u>, Senior Trial Counsel, U.S. Department of Justice, Commercial Litigation Branch – Civil Division, of Washington, DC, <u>Benjamin C. Mizer</u>, Principal Deputy Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and Reginald T. Blades, Assistant Director.  Of counsel on the brief was <u>Rebecca Cantu</u>, Senior Counsel, Office of the Chief Counsel for Enforcement and Compliance, U.S. Department of Commerce of Washington, DC.

<u>Timothy C. Brightbill</u> and <u>Maureen Elizabeth Thorson</u>, Wiley Rein LLP, of Washington DC, for defendant-intervenor.

Kelly, Judge:  This matter is before the court on Plaintiff's motion, pursuant to

USCIT Rule 65(a), for a preliminary injunction ("PI") seeking to enjoin Defendant, together

with its delegates, officers, agents, servants and employees of the United States Customs

and Border Protection ("Customs" or "CBP") from requiring it to pay cash deposits and

enter its solar modules as subject to antidumping and countervailing duty orders on

crystalline silicon photovoltaic ("CSPV") cells from the People's Republic of China after

the U.S. Department of Commerce ("Commerce") issued a scope ruling to the effect that

Plaintiff's merchandise falls within the scope of those orders.  See Pl.'s Mot. Prelim. Inj.

and Mem. P. & A. Supp. Thereof Confidential Version, Sept. 8, 2016, ECF. No. 20 ("PI

Mot."); see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into

Modules, From the People's Republic of China, 77 Fed. Reg. 73,017 (Dep't Commerce

Dec. 7, 2012) (countervailing duty order) ("CVD Order"); Crystalline Silicon Photovoltaic

Cells, Whether or Not Assembled into Modules, From the People's Republic of China, 77

Fed. Reg. 73,018 (Dep't Commerce Dec. 7, 2012) (amended final determination of sales

at less than fair value and antidumping duty order) ("AD Order"); Crystalline Silicon

Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic

of China: Final Ruling in the Sunpreme Scope Inquiry, Sept. 14, 2016, ECF No. 28-4

("Final Scope Ruling").  Additionally, Plaintiff avers that Commerce lacked authority to

issue instructions to CBP that permit the collection of cash deposits and suspension of

liquidation on entries entered prior to the initiation of the scope inquiry and that

Commerce's instructions to CBP are otherwise contrary to law.  PI Mot. 46–47; see also

Sunpreme Corrected Customs Instructions, AD PD 75, bar code 3505144-01 (Sept. 12,

2016); Sunpreme Corrected Customs Instructions, CVD PD 81, bar code 3505147-01

(Sept. 12, 2016).[1]  Therefore, even if the court allows the collection of cash deposits on

entries after the initiation of the scope inquiry to continue, Plaintiff requests an injunction

to prevent CBP from collecting cash deposits and suspending liquidation on entries

entered or withdrawn from warehouse prior to the initiation of the scope inquiry.  See PI

Mot. 46–47.  Plaintiff brought the underlying action to challenge Commerce's

determination that Plaintiff's solar modules are subject to antidumping and countervailing

duty orders covering certain crystalline silicon photovoltaic cells, whether or not

assembled into modules, from the People's Republic of China (collectively "Orders").  See

Compl., Aug. 26, 2016, ECF No. 2; see also Final Scope Ruling; CVD Order, 77 Fed.

Reg. 73,017; AD Order, 77 Fed. Reg. 73,018.

On September 9, 2016, Plaintiff requested expedited briefing on its motion for a

PI.  See Req. for Order to Show Cause Why Time to Respond to Pl.'s Mot. Prelim. Inj.

Should Not Be Shortened, Sept. 9, 2016, ECF No. 23.  After a telephone conference held

the same day, see Teleconference, Sept. 9, 2016, ECF No. 24, the court granted

Plaintiff's request for expedited briefing.  See Order, Sept. 9, 2016, ECF No. 25.  On

September 23, 2016, Defendant and Defendant-Intervenor filed response briefs opposing

Plaintiff's motion.[2]  See Def.'s Mem. Resp. Pl.'s Mot. Prelim. Inj. Confidential Version,

Sept. 23, 2016, ECF No. 33 ("Def.'s Resp. Br."); Def.-Intervenor SolarWorld Americas,

---

[1] On September 14, 2016, Commerce submitted indices to the confidential and public administrative records for its antidumping and countervailing duty scope proceedings.  Those administrative records can be found at ECF Nos. 28-2 and 28-3, respectively.  All further documents from the administrative records may be located in those appendices.

[2] On September 8, 2016, the court granted Defendant-Intervenor's consent motion to intervene as of right pursuant to USCIT Rule 24(a).  See Order, Sept. 8, 2016, ECF No. 18; Consent Mot. Intervene as a Matter of Right, Sept. 7, 2016, ECF No. 13.

Inc.'s Opp'n Pl. Sunpreme Inc.'s Mot. Prelim. Inj. Confidential Version, Sept. 23, 2016,

ECF No. 36 ("SolarWorld Br.").   On September 28, 2016, Plaintiff filed a motion for leave

to file a reply brief to the responses of Defendant and Defendant-Intervenor.  See Pl.'s

Mot. For Leave To File A Reply To Resps. of United States & SolarWorld Americas Inc.

To Pl.'s Mot. Prelim. Inj., Sept. 28, 2016, ECF No. 50.  Briefing on the motion concluded

on September, 29, 2016 when the court granted Plaintiff's motion.  See Order, Sept. 29,

2016, ECF No. 52; see also Pl.'s Reply to Resps. of Def. United States & SolarWorld

Americas Inc. to Pl.'s Mot. Prelim. Inj. Confidential Version, Sept. 29, 2016, ECF No. 53

("Sunpreme Reply Br.").

    For the reasons that follow, the court denies Plaintiff's motion to enjoin Commerce

from requiring it to pay cash deposits and enter its solar modules as subject to the

antidumping and countervailing duty orders on entries entered or withdrawn from

warehouse on or after the initiation of the scope inquiry.   However, the court enjoins

Commerce from ordering CBP to collect and CBP from collecting cash deposits on entries

entered or withdrawn from warehouse prior to the initiation of the scope inquiry.

## BACKGROUND

    Plaintiff, Sunpreme Inc. ("Sunpreme"), is a U.S.-based importer of solar modules

manufactured in the People's Republic of China.  PI Mot. 7; see also Compl. ¶6.  Plaintiff

describes its solar modules as containing bi-facial solar cells with "an innovative thin film

technology, the Hybrid Cell Technology, developed and owned by Sunpreme."  Compl.

¶22; PI Mot. 7.  Plaintiff alleges that it manufactures its cells at its facility in Jiaxing, China.

Compl. ¶20; PI Mot. 7.  Plaintiff avers that all of its solar modules that are the subject of

the Final Scope Ruling

> consist of solar cells made with amorphous silicon thin films and are certified
> by an [industry certification body] as thin film modules under the
> international standard IEC 61646: 2008 which covers "Thin film terrestrial
> photovoltaic (PV) modules.  Design qualification and type approval."

Compl. ¶21; PI Mot. 7.  Plaintiff alleges that its cells are "made of several layers of

amorphous silicon less than one micron in thickness, deposited on both sides of a

substrate consisting of a crystalline silicon wafer."  Compl. ¶23; PI Mot. 7.

Plaintiff alleges its cells have a p-i-n junction consisting of "thin film p-i-(wafer

substrate)-i-n junctions, formed by four amorphous silicon thin film depositions."  Compl.

¶24; PI Mot. 8—9.  Plaintiff asserts that "the junction is made by the layers of p/i and i/n

amorphous silicon on both the front and the back of the substrate, such that the junction

is formed on the wafer and inside the thin film layers."  Compl. ¶25; PI Mot. 9.  Plaintiff

claims it uses a

> blank crystalline silicon wafer as a substrate for the thin films in order to
> improve the mechanical reliability of the modules.  That wafer is not
> processed by doping, does not contain a p/n junction, nor is it otherwise
> processed to become a[ ] CSPV cell.  Without the amorphous silicon layers,
> the substrate is a blank silicon wafer, not a CSPV cell.

Compl. ¶26; PI Mot. 9.

On December 7, 2012, Commerce published the Orders.  See CVD Order, 77 Fed.

Reg. at 73,017; AD Order, 77 Fed. Reg. at 73,018.  The scope language of the Orders is

identical and provides:

> The merchandise covered by this order is crystalline silicon
> photovoltaic cells, and modules, laminates, and panels, consisting of
> crystalline silicon photovoltaic cells, whether or not partially or fully

> assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials.
> This order covers crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.
> . . .
> Excluded from the scope of this order are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS).

CVD Order, 77 Fed. Reg. at 73,017; AD Order, 77 Fed. Reg. at 73,018.

On December 11, 2012, Commerce notified Customs of the CVD Order and instructed Customs, effective December 6, 2012, to require cash deposits equal to the subsidy rates in effect at the time of entry. See Pl.'s Mot. Prelim. Inj. and Mem. P. & A. Supp. Thereof Confidential Version Att. 1 at Ex. 7, Sept. 8, 2016, ECF No. 20-1 ("Exs. Pl Mot."). On December 21, 2012, Commerce notified Customs of the AD Order and instructed Customs, effective December 7, 2012, to require a cash deposit or the posting of a bond equal to the dumping margins in effect at the time of entry. See Exs. Pl Mot. Att. 1 at Ex. 6. The messages to Customs contain, respectively, the antidumping duty and countervailing rates applicable to Plaintiff's entries. See Exs. Pl Mot. Att. 1 at Exs. 6, 7. Those rates are 13.94% and 15.24%, respectively. See Exs. Pl Mot. Att. 1 at Exs. 6, 7.

It is undisputed that Plaintiff had been filing its entries as type "01" ordinary consumption entries without depositing antidumping or countervailing duties prior to April 2015. See Def.'s Resp. Br. 4; see also Sunpreme Inc. v. United States, 40 CIT __, __,

145 F. Supp. 3d 1271, 1279 (2016).  CBP instructed Plaintiff to file its entries as type "03,"

the type of entries subject to antidumping and countervailing duties.  See Def.'s Resp. Br.

4; see also Sunpreme, 40 CIT at __, 145 F. Supp. 3d 1279.  Although Plaintiff ultimately

challenged CBP's action as contrary to law, Plaintiff complied with CBP's instructions.

See PI Mot. 12; see also Sunpreme, 40 CIT at __, 145 F. Supp. 3d at 1280.  This resulted

in the suspension of liquidation and the collection of cash deposits.  See 19 C.F.R.

§ 144.38(d)–(e) (2015);[3] see also Sections 484 and 592 of the Tariff Act of 1930,[4] as

amended, 19 U.S.C. §§ 1484, 1592; Sunpreme, 40 CIT at __, 145 F. Supp. 3d at 1292.

Plaintiff challenged CBP's determination to collect cash deposits prior to the initiation of

a scope inquiry as in excess of its statutory authority in a separate action.[5]  See

Sunpreme, 40 CIT at __, 145 F. Supp. 3d at 1271.  In that separate action, the court

issued a temporary restraining order, see id., and then a preliminary injunction halting

CBP's collection of cash deposits on its entries.[6]  Id., 40 CIT at __, 145 F. Supp. 3d at

1298–99.

---

[3] Further citations to the Code of Federal Regulations are to the 2015 edition.

[4] Further citations to the Tariff Act of 1930, as amended, are to the relevant provision of the U.S. Code, 2012 edition.

[5] Plaintiff challenged as ultra vires CBP's determination requiring it to enter its merchandise as subject to the Orders, which had the following consequences for Plaintiff's entries: (1) CBP required Plaintiff to enter its goods as type "03" entries, the type required for goods subject to AD and CVD orders; (2) CBP collected cash deposits; and (3) CBP suspended liquidation.  See Sunpreme, 40 CIT at __, 145 F. Supp. 3d at 1280 n. 4, 1281.

[6] The preliminary injunction issued by the court

> expire[d] upon the earlier of: (1) the entry of a final and conclusive court decision in this matter; or (2) Commerce's issuance of a preliminary or final scope determination to the effect that entries of solar modules containing bi-facial thin

(footnote continued)

On November 16, 2015, Plaintiff filed an application for a scope ruling pursuant to

19 C.F.R. § 351.225(c), requesting that Commerce find Plaintiff's solar modules outside

the scope of the Orders.  See Sunpreme Scope Ruling Request, AD PD 1–6, bar codes

3417556-01–06 (Nov. 16, 2015); Sunpreme Scope Ruling Request, CVD PD 1–6, bar

codes 3417582-01–06 (Nov. 16, 2015).   Plaintiff alleges it requested that Commerce

issue a scope ruling on an expedited basis due to financial difficulties the company was

experiencing.[7]  Compl. ¶28; PI Mot. 10.  On December 30, 2015, Commerce initiated a

formal scope inquiry pursuant to 19 C.F.R. § 351.225(e).  See Scope Inquiry Initiation on

Photovoltaic Modules Imported by Sunpreme, AD PD 9, bar code 3428728-01 (Dec. 30,

2015); Scope Inquiry Initiation on Photovoltaic Modules Imported by Sunpreme, CVD PD

15, bar code 3428730-01 (Dec. 30, 2015).

---

film cells made with amorphous silicon from the People's Republic of China that
are the subject of this action are included within the scope of Crystalline Silicon
Photovoltaic Cells, Whether or Not Assembled into Modules, From the People's
Republic of China, 77 Fed. Reg. 73,018 (Dep't Commerce Dec. 7, 2012) (amended
final determination of sales at less than fair value, and antidumping duty order) and
Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules,
From the People's Republic of China, 77 Fed. Reg. 73,017 (Dep't Commerce Dec.
7, 2012) (countervailing duty order).

Sunpreme, 40 CIT at __, 145 F. Supp. 3d at 1299.
        While the preliminary injunction remained in effect, Plaintiff was importing its merchandise
without posting cash deposits for antidumping duties and countervailing duties. Plaintiff
acknowledges that the preliminary injunction "provided some relief to Sunpreme and allowed it to
continue to do business."  PI Mot. 4.  However, the preliminary injunction, by its terms, expired on
July 29, 2016, when Commerce issued its Final Scope Ruling to the effect that Plaintiff's goods
are subject to the Orders.  See Sunpreme, 40 CIT at __, 145 F. Supp. 3d at 1299; see also Final
Scope Ruling at 19.

[7] Plaintiff alleges these financial difficulties are being caused by the cash deposit requirement,
which Plaintiff contends is causing its [[                                                                        ]] and
threatening Sunpreme's [[                              ]].  See PI Mot. 4.

On June 17, 2016, Commerce placed a final ruling in a scope inquiry involving the

applicability of the Orders to Triex photovoltaic cells manufactured by Silevo, Inc. on the

record of this scope proceeding.  See Memo re: Crystalline Silicon Photovoltaic Cells,

Whether or Not Assembled into Modules, From the People's Republic of China: Request

for Additional Factual Information and Comments in Sunpreme Scope Inquiry at Att., AD

PD 29, bar code 3479321-01 (June 17, 2016); Memo re: Crystalline Silicon Photovoltaic

Cells, Whether or Not Assembled into Modules, From the People's Republic of China:

Request for Additional Factual Information and Comments in Sunpreme Scope Inquiry at

Att., CVD PD 35, bar code 3479320-01 (June 17, 2016) (collectively "Triex Scope

Ruling").  In that determination, Commerce found the Triex solar cell to be covered by the

scope of the Orders.  See id.  Commerce invited interested parties to submit additional

factual information and comments to distinguish the relevant Sunpreme product from the

Triex product.   Memo re: Crystalline Silicon Photovoltaic Cells, Whether or Not

Assembled into Modules, From the People's Republic of China: Request for Additional

Factual Information and Comments in Sunpreme Scope Inquiry at 1, AD PD 29, bar code

3479321-01 (June 17, 2016); Memo re: Crystalline Silicon Photovoltaic Cells, Whether or

Not Assembled into Modules, From the People's Republic of China: Request for

Additional Factual Information and Comments in Sunpreme Scope Inquiry at 1, CVD PD

35, bar code 3479320-01 (June 17, 2016)

In its Final Scope Ruling, Commerce determined that Plaintiff's solar modules fall

within the scope of the Orders based on the language of the Orders and the criteria in 19

C.F.R. § 351.225(k)(1).  Final Scope Ruling at 19.  On August 1, 2016, Commerce notified

CBP that Plaintiff's merchandise was within the scope of the Orders and instructed

Customs to "[c]ontinue to suspend liquidation of entries of solar cells from the PRC,

including the bifacial solar products imported by Sunpreme . . . subject to the antidumping

[and countervailing] duty order[s] on solar cells from the PRC."   Sunpreme Customs

Instructions, PD 74, bar code 3505143-01 (Sept. 12, 2016); Sunpreme Customs

Instructions, PD 80, bar code 3505146-01 (Sept. 12, 2016).   On September 2, 2016,

Commerce issued messages to Customs correcting its prior instructions regarding

suspension of liquidation.  The corrected messages instruct Commerce to

> [c]ontinue to suspend liquidation of entries of merchandise subject to the
> antidumping [and countervailing] duty order[s] on solar cells from the PRC.
> Accordingly, because the bifacial solar products imported by Sunpreme,
> described above, are subject to the antidumping [and countervailing] duty
> order[s] on solar cells from the PRC, for entries of such merchandise that
> are currently suspended from liquidation, continue to suspend those entries
> from liquidation.   For entries of bifacial solar products imported by
> Sunpreme, described above, that are not already suspended from
> liquidation, begin suspension and collect cash deposits at the applicable
> rate for entries that entered or were withdrawn from warehouse for
> consumption on or after 12/30/2015.

Corrected Sunpreme Customs Instructions, AD PD 75, bar code 3505144-01 (Sept. 12,

2016); Corrected Sunpreme Customs Instructions, CVD PD 81, bar code 3505147-01

(Sept. 12, 2016).

## <u>JURISDICTION AND STANDARD OF REVIEW</u>

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a

(a)(2)(B)(vi) and 28 U.S.C. § 1581(c) (2012).

A preliminary injunction is an extraordinary form of equitable relief that is only

appropriate where the moving party establishes that: (1) it will suffer irreparable harm

absent the requested relief; (2) it is likely to succeed on the merits of its underlying claim; (3) the balance of hardships favors the movant; and (4) the public interest would be better served by granting the relief.  See Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008) (citations omitted); Zenith Radio Corp. v. United States, 710 F.2d 806, 809 (Fed. Cir. 1983) (citations omitted).  While "'no one factor, taken individually, is necessarily dispositive,'" Ugine & Alz Belg. v. United States, 452 F.3d 1289, 1292–93 (Fed. Cir. 2006) (quoting FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993)), "irrespective of relative or public harms, a movant must establish both a likelihood of success on the merits *and* irreparable harm."  Reebok Int'l Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1556 (Fed. Cir. 1994).  "If a preliminary injunction is granted by the trial court, the weakness of the showing regarding one factor may be overborne by the strength of the others."  FMC Corp., 3 F.3d at 427.

Therefore, "'the more the balance of irreparable harm inclines in the plaintiff's favor, the smaller the likelihood of prevailing on the merits he need show in order to get the injunction.'"  Qingdao Taifa Grp. Co. v. United States, 581 F.3d 1375, 1378—79 (Fed. Cir. 2009) (quoting Kowalski v. Chi. Tribune Co., 854 F.2d 168, 170 (7th Cir. 1988)).  That said, "a showing on one preliminary injunction factor does not warrant injunctive relief in light of a weak showing on other factors."  Wind Tower Trade Coalition v. United States, 741 F.3d 89, 100 (Fed. Cir. 2014) (citing Winter, 555 U.S. at 22).

## DISCUSSION

### I.  Irreparable Harm

A plaintiff seeking a preliminary injunction must demonstrate that irreparable injury is likely in the absence of the injunction.  Winter, 555 U.S. at 22.  Harm is irreparable when "no damages payment, however great," could address it.  Celsis In Vitro, Inc. v. CellzDirect, Inc., 664 F.3d 922, 930 (Fed. Cir. 2012).  In addition to alleging that the injury is irreparable, Plaintiff must demonstrate the injury is immediate.  See Zenith, 710 F.2d at 809.  However, the injury complained of need not have been inflicted when the application is made, or be certain to occur.  See United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953) (holding that the movant must show a "cognizable danger of recurrent violation, something more than a mere possibility which serves to keep the case alive").  Therefore, to evaluate whether the harm is sufficient to warrant the requested relief, the court analyzes the magnitude of the injury, the immediacy of the injury, and the inadequacy of future corrective relief.

Generally, an allegation of financial loss alone, however substantial, which is compensable with monetary damages, is not irreparable harm if such corrective relief will be available at a later date.  See Sampson v. Murray, 415 U.S. 61, 90, 94 (1974).  Nonetheless, irreparable harm may take the form of "[p]rice erosion, loss of goodwill, damage to reputation, and loss of business opportunities."  Celsis In Vitro, 664 F.3d at 930 (citing Abbott Labs. v. Sandoz, Inc., 544 F.3d 1341, 1362 (Fed. Cir. 2008)).  Bankruptcy or substantial loss of business is sufficiently grave and irreparable to demonstrate the inadequacy of corrective relief because, in addition to the obvious

economic injury, loss of business renders a final judgment ineffective, depriving the

movant of meaningful judicial review.  See Doran v. Salem Inn, Inc., 422 U.S. 922, 932

(1975); McAfee v. United States, 3 CIT 20, 24, 531 F. Supp. 177, 179 (1982).

Here, Plaintiff has demonstrated in the form of an affidavit from a key executive

with knowledge of its financial position as well as financial documentation that it is likely

to suffer grave, immediate, and irreparable harm if an injunction is not granted.[8]  Exs. Pl

Mot. at Ex. 9.  Plaintiff has also demonstrated the immediacy of the potential harm through

---

[8] Plaintiff has submitted an affidavit supporting its claims that continuing to post cash deposits during the pendency of its challenge to Commerce's scope determination would [[
                                        ]] because it would [[                                                    ]]
and [[                                         ]].  See Exs. Pl Mot. at Ex. 9.  The Sunpreme executive's affidavit includes a chart documenting that the company's [[


                        ]].  Id. Ex. 9 at ¶¶9–10.  In fact, the affidavit indicates that, as of July 31,
2016, the company [[                                                                                      ]].  Id.
at ¶10.  Sunpreme has also included bank statements, audited financial statements for 2013–
2014 and 2014–2015, unaudited financial statements for 2016, the company's 2014 U.S. tax
return and correspondence with [[
                                        ]].  See id. Ex. 10–14.  Sunpreme points to [[
                                                ]] as well as a [[
                        ]] and its inability to [[                                    ]] as raising serious doubts
about [[                                            ]]  Id. Ex. 9 at ¶12.  Sunpreme alleges
that sales of solar modules to the United States represented [[    ]]% of its revenue in 2015 and
[[      ]]% of its 2016 revenue year-to-date.  See id. Ex. 9 at ¶16.  Therefore, Sunpreme has
provided documentary support for its allegations that it is likely that: (1) it lacks [[
                                        ]]; and (2) its non-U.S. markets [[

                        ]] while the scope issue is adjudicated.  Id.  Moreover, Sunpreme alleges
that it [[
                        ]].  Id. Ex. 9 at ¶21.
        Sunpreme has also demonstrated that it would suffer a loss of goodwill, damage to its
reputation, and substantial loss of business opportunities if it is [[
        ]] solar modules to customers in the United States.  Id. Ex. 9 at ¶21.  It is unlikely customers
[[                                            ]] if the company cannot [[
                                ]].  Sunpreme also references the [[                                    ]]
between November 13, 2015 and March 31, 2016.  Id. Ex. 9 at ¶26.

the seriousness of its [[

]]<sup>9</sup>  See Id. at Ex. 9.

---

[9] Although Defendant-Intervenor questions the sufficiency of the evidence submitted by Plaintiff to support its allegation that it [[

]], Defendant-Intervenor's points serve to undercut the immediacy of the harm, not its magnitude or the inadequacy of future corrective relief.  For example, Defendant-Intervenor highlights that Sunpreme does not mention that it recently received a $5 million "SunShot" award from the U.S. Department of Energy, SolarWorld Resp. Br. 5 (citing id. at Ex. 2), or that it secured additional financing in 2016, including [[                                              ]].  Id. at 8 (citing Pl.'s Supp. Exs. Ex. 11 at 47).  Plaintiff responds that it did not receive the "SunShot" award until September 14, 2016, seven days after it filed its motion for a PI.  Sunpreme Reply Br. 2.  Plaintiff also contends that the parameters of the "SunShot" award do not provide Plaintiff any relief from its financial situation because the terms of the award require it to initially cover the costs of research projects, and the contract does not allow for any profit and forbids the company from using the award for its general business operations.  See id. (citing id. at Ex. 2).

Given the volume and value of Plaintiff's anticipated imports, which it estimates at approximately [[            ]] through the end of 2016, see Exs. Pl Mot. Ex. 9 at ¶16, the size of the anticipated antidumping and countervailing duty cash deposits it would be forced to post (i.e., 13.94% ad valorem and 15.24% ad valorem, respectively), and the company's account of its [[        ]] circumstances, see id. Ex. 9 at ¶12, Defendant-Intervenor's speculation that the "SunShot" award or the additional financing would materially affect Plaintiff's longer term [[                                    ]] is likely unfounded.

Defendant-Intervenor also points to several deficiencies in documentation submitted by Plaintiff to back up certain allegations in the affidavit from a Sunpreme senior executive.  For example, Defendant-Intervenor contends that Plaintiff has failed to provide Master Supply Agreements that Plaintiff alleges oblige it to [[                                        ]] and to return customer deposits if it cannot deliver contracted goods.  SolarWorld Resp. Br. 6.  Defendant-Intervenor also highlights a lack of documentary evidence of the [[

]], to substantiate the [[                             ]] if it is unable to deliver on a large customer contracts, and to substantiate [[

]].  See id. at 6–8.  Defendant-Intervenor also speculates that Plaintiff's financial harm is not the result of the cash deposit requirements because the financial statements submitted indicate the company [[

]].  See id. at 8.  Whether the company was in [[

]] prior to the collection of cash deposits does not undermine the notion that the continued collection of cash deposits would cause Plaintiff irreparable harm.  Moreover, Plaintiff need only show likely irreparable harm, not certain irreparable harm.  See Winter, 555 U.S. at 22.

Finally, Defendant-Intervenor argues that the court should not ameliorate the consequences of Plaintiff's failure to develop markets outside of the United States and otherwise manage its risk.  Def.'s Resp. Br. 9.  However, Defendant-Intervenor does not relate this point to the irreparable harm standard.  Defendant-Intervenor points to no authority requiring a movant to show harm was avoidable in order to be entitled to a preliminary injunction.

Without a preliminary injunction to limit Plaintiff from suffering further harm in the form of loss of goodwill, damage to its reputation, and loss of business opportunities from the continued collection of cash deposits until the case is resolved on the merits, the harm to Plaintiff's business will only grow more severe.  In addition, Plaintiff provides sufficient documentary support to demonstrate that the continued collection of cash deposits will cause irreparable harm to Plaintiff because it will either force Plaintiff [[                    ]] or cause serious and substantial disruption to [[                    ]] of the company [[                    ]].

## II. Likelihood of Success on the Merits

The party seeking injunctive relief "must demonstrate at least a 'fair chance of success on the merits.'"  Qingdao Taifa, 581 F.3d at 1381 (quoting U.S. Ass'n of Imps. of Textiles & Apparel v. Dep't of Commerce, 413 F.3d 1344, 1347 (Fed. Cir. 2005)).  Where a plaintiff has shown that a strong threat of irreparable harm exists, "the burden to show a likelihood of success [on the merits] is necessarily lower."  Id.  Unlike preliminary injunctions to suspend liquidation, which preserve a plaintiff's legal options and allow for a full and fair review of duty determinations before liquidation and are contemplated by the statute, see 19 U.S.C. § 1516a(c)(2); see also Qingdao Taifa, 581 F.3d at 1382, paying deposits pending court review of a Commerce scope ruling is an ordinary consequence of the statutory scheme.  See 19 U.S.C. §§ 1673d(c)(1)(B)(ii), 1673e(a)(3), 1675(a)(1), 1675(a)(2)(B)(iii), 1675(a)(2)(C); see also Shree Rama Enterprises v. United States, 21 CIT 1165, 1169, 983 F. Supp. 192, 196 (1997).  While the need to demonstrate

the likelihood of success may be lessened where there is a strong showing of irreparable harm, it is not extinguished altogether.  See Qingdao Taifa, 581 F.3d at 1381.

Plaintiff challenges the scope determination as both contrary to law and unsupported by substantial evidence.  PI Mot. 21.  Specifically, Plaintiff first argues that Commerce's interpretation of the thin film exclusion is contrary to law because it added conditions not supported by the scope language or the sources Commerce may consult under 19 C.F.R. § 351.225(k)(1).  Id. at 22–29.  Second, Sunpreme argues Commerce failed to consider evidence demonstrating that its merchandise falls within the thin film exclusion in the Orders.  Id. at 30–33.  Third, Sunpreme argues Commerce's determination is based on factual misstatements.  Id. at 34–45.

Plaintiff argues that Commerce failed to ground its conclusion that Plaintiff's merchandise are CSPV cells with a p/n junction not entitled to the thin film exclusion in the scope language or any of the (k)(1) sources.  PI Mot. 23–29.  Defendant responds that Plaintiff fails to show that Commerce unreasonably concluded, based upon its consultation of the (k)(1) sources, that Sunpreme's cells were CSPVs notwithstanding the addition of thin films of amorphous silicon.  Def.'s Resp. Br. 17–21.

The language of an order dictates its scope.  See Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1097 (Fed. Cir. 2002) (citing Ericsson GE Mobile Commc'ns, Inc. v. United States, 60 F.3d 778, 782 (Fed Cir. 1995)).  Commerce's regulations provide that, where Commerce issues scope rulings to clarify the scope of an order with respect to particular products, in addition to the scope language, Commerce will take into account descriptions of the merchandise contained in: (1) the petition; (2) the initial investigation;

(3) and past determinations by Commerce, including prior scope determinations (collectively "(k)(1) sources").  19 C.F.R. § 351.225(k)(1).  Commerce has broad authority "to interpret and clarify its antidumping duty orders."  Ericsson GE Mobile, 60 F.3d at 782 (citing Smith Corona Corp. v. United States, 915 F.2d 683, 686 (Fed. Cir. 1990)), as corrected on reh'g (Sept. 1, 1995); see also King Supply Co., LLC v. United States, 674 F.3d 1343, 1349 (Fed. Cir. 2012).  However, Commerce may not interpret an order "so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms."  Eckstrom Indus., Inc. v. United States, 254 F.3d 1068, 1072 (Fed. Cir. 2001) (citing Wheatland Tube Co. v. United States, 161 F.3d 1365, 1370 (Fed. Cir. 1998)).  Furthermore, "[s]cope orders may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it."  Duferco, 296 F.3d at 1089.  Although the petition and the investigation proceedings may aid in Commerce's interpretation of the final order, the order itself "reflects the decision that has been made as to which merchandise is within the final scope of the investigation and is subject to the order."  Id. at 1096.

The Orders at issue provide:

> The merchandise covered by this order is crystalline silicon photovoltaic cells, and modules, laminates, and panels, consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials.
> This order covers crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of

materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

. . .

Excluded from the scope of this order are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS).

CVD Order, 77 Fed. Reg. 73,017; AD Order, 77 Fed. Reg. 73,018.

In its scope ruling Commerce considered the plain language of the Orders and determined that the scope language calls upon it to consider whether Sunpreme's products: "(1) are CSPV cells, (2) are at least 20 micrometers [("µm")] thick, (3) contain a p/n junction, and (4) are excluded thin film products."  Final Scope Ruling at 13. Commerce consulted the (k)(1) sources to interpret the relevant scope language, and it concluded that Sunpreme's products were in scope.  Sunpreme has not shown that it is likely the court will find that Commerce lacked substantial evidence to find that its merchandise met all of these criteria or that Commerce could not reasonably have interpreted the Orders to include Plaintiff's merchandise.

1. **CSPV Cells**

In considering whether Plaintiff's products are CSPV cells, Commerce clarified that "CSPV cells," as used in the Orders, include wafers and freestanding cells made of crystalline silicon that rely on the crystalline silicon wafer to generate electricity.  Final Scope Ruling at 13.  Moreover, Commerce read the scope language as not "preclude[ing] the use of other materials, such as amorphous silicon or metal oxides, in CSPV cell production."  Final Scope Ruling at 13.  Commerce also noted that the Orders did not "stipulate that the crystalline silicon *within* subject CSPV cells must be able to independently function as a solar cell even before it is incorporated into the relevant

photovoltaic product."  Final Scope Ruling at 13.  The court cannot say that Sunpreme

has raised a serious question as to the reasonableness of Commerce's interpretation.

Relying upon its prior scope determination in the Triex Scope Ruling, a (k)(1)

source, Commerce noted that CSPV cells rely upon crystalline silicon to generate

electricity.  Final Scope Ruling at 13 (citing Triex Scope Ruling at 30).  Commerce

determined that the scope language does not require that the crystalline silicon

component within a CSPV cell be able to independently function as a solar cell even

before it is incorporated into the photovoltaic product.  Final Scope Ruling at 13.  Crediting

Sunpreme's acknowledgment that the doped crystalline silicon substrates in its cells are

the primary solar absorber over conflicting statements regarding the function of the

crystalline silicon wafer in its cells, Commerce concluded that Sunpreme's cells rely upon

the crystalline silicon to generate electricity.[10]  Final Scope Ruling at 14 (citing Petitioner

Comments on Sunpreme Scope Ruling Request at Ex. 21, AD PD 15–16, bar codes

3434369-01–02 (Jan. 20, 2016) and Petitioner Comments on Sunpreme Scope Ruling

Request at Ex. 21, CVD PD 21–22, bar codes 3434365-01–02 (Jan. 20, 2016)

(collectively "SolarWorld Comments on Scope Ruling Request"); Sunpreme Additional

Factual Information at Ex. 7, AD PD 32–48, bar codes 3481978-01–12 (June 27, 2016),

---

[10] Commerce explained its decision to credit information that the silicon wafer in Sunpreme's cell plays a role in electricity generation over conflicting statements that indicate the wafer is inert and does not interact with the thin film layers by referencing the patent for the technology, which Commerce found specifies the crystalline silicon substrate is part of the cell's electricity generating p/i/n/ junction.  Final Scope Ruling at 14 (citing Petitioner Comments on Sunpreme Scope Ruling Request at Ex. 6, AD PD 15–16, bar codes 3434369-01–02 (Jan. 20, 2016) and Petitioner Comments on Sunpreme Scope Ruling Request at Ex. 6, CVD PD 21–22, bar codes 3434365-01–02 (Jan. 20, 2016)).  It would be inappropriate for the court to reweigh the evidence.

Sunpreme Additional Factual Information at Ex. 7, CVD PD 38–54, bar codes 3481991-

01–17 (June 27, 2016) (collectively "Sunpreme Triex Comments")); Sunpreme Response

to Petitioner's Letter at Ex. 4, AD PD 24–25, bar codes 3440093-01–02 (Feb. 8, 2016),

Sunpreme Response to Petitioner's Letter at Ex. 4, CVD PD 30–31, bar codes 3440101-

01–02 (Feb. 8, 2016) (collectively "Sunpreme Rebuttal Comments").  Plaintiff fails to raise

a significant question as to the reasonableness of Commerce's interpretation.

Commerce also grounded its determination that Sunpreme's cells rely on

crystalline silicon to generate electricity in the fact that the crystalline silicon in

Sunpreme's product is slightly doped.   Final Scope Ruling at 14.   In reaching this

conclusion, Commerce referenced its finding in the Triex Scope Ruling, to the effect that

the doping (i.e., processing) of the wafer enhances the wafer's ability to absorb light.  See

Triex Scope Ruling at 30.  Finally, Commerce found that the presence of thin film layers

does not undermine the fact that the crystalline silicon is essential to the cell's electricity

generating function.  See Final Scope Ruling at 14 (citing Triex Scope Ruling at 30).

Given the words of the orders and the descriptions of the merchandise relied upon by

Commerce, Plaintiff fails to raise a significant question as to the reasonableness of

Commerce's conclusion that Sunpreme's products are CSPV cells.  See SolarWorld

Comments on Scope Ruling Request at Ex. 21; Sunpreme Triex Comments at Ex. 7;

Sunpreme Rebuttal Comments at Ex. 4; Triex Scope Ruling at 30.

Plaintiff claims that Commerce "effectively expands the scope language to include

any cells containing crystalline silicon substrates/wafers despite the multiple express

statements during the investigations, by Petitioner and Commerce, that wafers are not

covered by the investigations."  PI Mot. 35.  Commerce concluded, relying in part on its prior Triex Scope Ruling, that where the crystalline silicon component performs a key role in electricity generation, the cell is a CSPV cell.  Final Scope Ruling at 13—14.  In reaching the conclusion that Plaintiff's cells are CSPV cells, Commerce relied upon descriptions of the product contained in the application, the petition, and prior scope determinations to conclude that the crystalline silicon played an active role in the cell's electricity generating function.  See Final Scope Ruling at 13—14.  Therefore, Commerce relied upon the function of the substrate/wafer within the cell to determine that the cell was a CSPV cell.  See Final Scope Ruling at 13–14.  Commerce found that a photovoltaic cell containing crystalline silicon performing the function of electricity generation is a CSPV cell, not that any photovoltaic cell containing crystalline silicon is a CSPV cell.  See id.  Although Plaintiff's arguments focus on the wafers' inability to generate electricity on their own, they do not refute Commerce's implicit finding that the crystalline silicon interacts with other elements in the cell to generate electricity or that the crystalline silicon component is critical to the cell's ability to do so.  See PI Mot. 35; see also Final Scope Ruling at 13–14.

Plaintiff contends that a cell where the p/n junction is formed outside of the wafer used for its substrate is not a CSPV.  PI Mot. 37.  However, Plaintiff points to no language in the Orders indicating that the p/n junction formation must occur within the crystalline silicon component.

Plaintiff also argues that Commerce's finding that the crystalline silicon in Sunpreme's cell is "active," "doped" or "functional" is unsupported by the record.  PI Mot.

38.   Plaintiff maintains that Commerce lacked record evidence to conclude that its raw silicon wafer is doped, by which Plaintiff means having a slight positive or negative orientation.[11]   Id.   Plaintiff focuses on the fact that its own production of the wafers does not achieve the slight positive or negative orientation, but rather that this orientation is present prior to its manufacturing process.   See id. at 38, 39 n.18.   However, Defendant underscores that while Sunpreme understands the meaning of the term "doped" as having a positive or negative orientation, Commerce uses "doped" to mean "processed" to enhance light absorption (i.e., making the substrate an active component of the cell).   Def.'s Resp. Br. 20 (citing Final Scope Ruling at 14; Triex Scope Ruling at 30).   Plaintiff points to no evidence undermining Commerce's use of the term doped as enhancing light absorption.   Sunpreme focuses on the fact that the wafers themselves are "incapable of converting light to electricity."   PI Mot. 41.   However, as already discussed, Commerce did not find that the wafers generate electricity without interacting with other parts of the cell.   See Final Scope Ruling at 14.   Nor did Commerce find that Sunpreme's production process imparts the positive negative orientation to its crystalline silicon substrates.   See

---

[11] Sunpreme argues that Commerce mischaracterizes its statements that its products are "'monocrystalline silicon cell[s]' with a doped crystalline silicon component."   PI Mot. 43 (citing Final Scope Ruling at 14, 14 n.139).   However, Commerce did not rely upon Sunpreme's statements to make its determination.   Rather, Commerce merely noted these statements and credited patent information, not Sunpreme's statements, to find that Sunpreme's products rely upon the crystalline silicon component to generate electricity.   Final Scope Ruling at 14.   As already noted, the court sees no reason to reweigh the evidence on this issue.

id. at 13.  Rather Commerce found that the cells "rely on crystalline silicon to generate electricity."[12]  Id.  Sunpreme offers no record evidence detracting from this finding.[13]

### 2. Cells At Least 20 Micrometers Thick

Having concluded that Plaintiff's products are CSPV cells, Commerce also clarified that the language of the Orders requiring "cells of thickness equal to or greater than 20 micrometers" requires it to consider the thickness of the entire cell, including the crystalline silicon component.  Final Scope Ruling at 14.  Plaintiff points to no evidence or rationale to suggest that this interpretation is unreasonable.  Since Commerce

---

[12] In fact Commerce explicitly acknowledges that crystalline silicon may not "be able to independently function as a solar cell even before it is incorporated into the relevant photovoltaic product."  Final Scope Ruling at 13.

[13] Sunpreme concedes that its raw silicon wafers can absorb sunlight, but focuses on their inability to convert sunlight to electricity on their own.  PI Mot. 41–42.  Sunpreme mischaracterizes Commerce's determination as treating the wafers' capacity to absorb sunlight as equivalent to their ability to generate electricity.  Id.  Commerce explicitly found that nothing in the scope language indicates that the crystalline silicon component must be able to function as a solar cell before it is incorporated into the relevant photovoltaic product.  Final Scope Ruling at 13.  It is clear from that statement that Commerce recognizes that the silicon wafer cannot generate electricity on its own.  See id.  Rather, Commerce relied upon the interaction of the silicon wafer with other components of the cell to conclude that the crystalline silicon component was critical to its electricity generating function.  See id. at 14.

    Sunpreme further argues that Commerce's focus on the function of the crystalline silicon substrate is not based on any (k)(1) sources, but rather is based upon a statement by a third party in the Triex Scope Inquiry.  PI Mot. 42 (citing Final Scope Ruling at 13 n.137 (citing Triex Scope Ruling at 30)).  However, Commerce's regulation permits it to rely upon prior scope determinations.  19 C.F.R. § 351.225(k)(1).  Sunpreme does not allege that Commerce relied upon its prior scope determination for facts about Sunpreme's product, but rather for the notion that the substrate's involvement in electricity generation determines whether it is a CSPV cell within the context of the Orders.  See PI Mot. 42.

    As the court stated earlier, Commerce credited patent information on the record over other statements in the record to reach its conclusion regarding the function of the crystalline silicon component within Sunpreme's cells.  See Final Scope Ruling at 14.  Although Sunpreme argues that the products subject to this scope ruling represent a cell developed well after the issuance of the patent, PI Mot. 42 n.21, Sunpreme does not point to any record information indicating that the crystalline silicon component functions materially differently in this product.  Therefore, the court defers to Commerce's weighing of the evidence.

concluded the substrate plays an active role in the cell, Plaintiff fails to point to any language or (k)(1) sources that indicate that the measurement contained in the scope language was not intended to measure the thickness of the components that make up the active parts of the cell.    Plaintiff fails to raise a significant question as to the reasonableness of Commerce's determination that Sunpreme's cells are 20 μm thick.

### 3.   Contain a P/N Junction Formed By Any Means

Commerce relied on its prior scope ruling to the effect that "a p/i/n junction and other arrangements of positive, negative, and intrinsic/neutral layers within a photovoltaic cell can be understood to be types of p/n junctions" within the meaning of the scope language.  Final Scope Ruling at 15 (citing Triex Scope Ruling at 18, 32).  In the Triex Scope Ruling, Commerce found that the language "formed by any means" in the Orders indicates "that the type, location, and method by which the p/n junction is formed are irrelevant." Triex Scope Ruling at 17. [14]  In its Triex Scope Ruling, Commerce focused on the words "formed by any means," and Commerce determined this language indicates that the function determines whether a p/n junction has been formed, not the specific architecture of the p/n junction.  Triex Scope Ruling at 17.  Commerce determined that "some type of p/n junction is essential to the creation of an electrical field" in photovoltaic cells; and therefore, the scope language does not imply photovoltaic cells can be categorized into those with p/n junctions and those lacking them.  See id. at 17–18.

---

[14] Commerce referenced its determination in its Triex Scope Ruling that, based upon its consultation of (k)(2) sources, a p/n junction "'can be interpreted as an umbrella term, covering different combinations of positive and negative regions and various means of transferring an electrical charge therein.'"  Final Scope Ruling at 15 n.150 (citing Triex Scope Ruling at 31).

Commerce resolved that a p/i/n junction is a type of p/n junction formed by any means because the intrinsic (i.e., inert or "i") layer in the Triex cells merely extends the electrical field over an additional layer of material.  Id. at 18.

Here, Commerce found that none of the (k)(1) sources consulted indicate that the positive and negative layers in a p/n junction must be adjacent or that they must be within a crystalline silicon wafer.   Final Scope Ruling at 15.   Commerce referenced its consultation to pre-initiation versions of the scope language in its prior Triex Scope Ruling in which Commerce found that the petitioner intended to include p/n junctions not within the crystalline silicon component in the scope deliberately because Commerce believed a detailed description of the architecture of junction formation to be unnecessary to defining a p/n junction.   See id. (citing Triex Scope Ruling at 13, 31).   Therefore, Commerce concluded Plaintiff's product "can be understood to contain a 'p/n junction formed by any means.'"   Id.   Plaintiff has failed to raise a significant issue with the reasonableness of Commerce's reliance on a (k)(1) source or its reasoning to determine that the p/i/n junction in Plaintiff's merchandise is a p/n junction "formed by any means."

Plaintiff contends that Commerce ignored substantial evidence on the record of the distinctions between p/n junctions and p/i/n junctions and reached its conclusion without any citation to scientific evidence about Sunpreme's products.   Pl Mot. 44. However, Commerce made reference to materials published by the U.S. Department of Energy and by CBP as well as the expert opinions and declarations submitted by Plaintiff to support its position that p/n junctions are distinct from p/i/n junctions.   Final Scope Ruling at 16.  Commerce explained that it reached its determination based upon a textual

interpretation and the (k)(1) sources it consulted, which do not include factual assertions

made by individuals or entities who were not involved in drafting the scope language (i.e.,

19 C.F.R. § 351.225(k)(2) sources).[15]  Id.  Commerce found that the (k)(1) sources were

dispositive and allowed it to interpret the scope language without resort to these (k)(2)

sources.  See id.  Plaintiff points to nothing in the scope language or in the (k)(1) sources

consulted by Commerce that contradicts Commerce's conclusions.

Sunpreme also claims that Commerce lacked any scientific evidence to conclude

that a p/i/n junction is a form of p/n junction and ignored evidence on the record regarding

the distinctions between p/n junctions and p/i/n junctions.  PI Mot. 43–44.  However,

Commerce relied upon its prior Triex Scope Ruling, and incorporated its reasoning, for

the proposition that the positive and negative layers need not be adjacent to one another

to form a p/n junction.  Final Scope Ruling at 15 (citing Triex Scope Ruling at 32).  Plaintiff

does not attack the underlying reasoning in the Triex Scope Ruling.  See PI Mot. 43–44.

Sunpreme takes issue with Commerce's reliance on the Triex Scope Ruling altogether

because Commerce's determination that a p/i/n junction is a type of p/n junction relied

upon (k)(2) factors.  PI Mot. 45.  However, Commerce may rely upon prior determinations

---

[15] Commerce's regulation provides that when the (k)(1) sources (i.e., the descriptions of the merchandise contained in the petition, the initial investigation, and prior scope determinations) are not dispositive, Commerce will further consider:

  (i)    The physical characteristics of the product;
  (ii)   The expectations of the ultimate purchasers;
  (iii)  The ultimate use of the product;
  (iv)   The channels of trade in which the product is sold; and
  (v)    The manner in which the product is advertised and displayed.

19 C.F.R. § 351.225(k)(2).

in interpreting the scope of an antidumping or countervailing duty order. 19 C.F.R.

§ 351.225(k)(1). Plaintiff points to no reason why such reliance is unreasonable.[16]

Plaintiff argues Commerce was unwilling to consider differences in its technology

and that of the Triex cell, which it argues reflects "Commerce's foregone conclusion that

Sunpreme's product must be identical to the Triex product." PI Mot. 44. However,

Commerce acknowledged the differences highlighted by Plaintiff, but it found those

differences did not undercut the formation of a p/n junction because the electrical field

generating function or nature of the p/n junction in the cell is unchanged by the addition

of an insulating material.[17] Final Scope Ruling at 15 (citing Triex Scope Ruling at 32, 39).

Plaintiff points to no difference in its technology that raises a significant question as to the

reasonableness of Commerce's determination.

---

[16] Neither of the two cases Plaintiff cites supports the proposition that Commerce may not rely upon its conclusions in another scope ruling where Commerce determines that the same products are involved. See PI Mot. 45 (citing Tianjin Mach. Imp. & Exp. Corp. v. United States, 29 CIT 1216, 1225, 394 F. Supp. 2d 1369, 1377—78) (2005); Shenyang Yuanda Aluminium Industry Eng'g Co. v. United States, 40 CIT __, ___, 146 F. Supp. 3d 1331, 1346—47 (2016). In Tianjin Mach., the court held merely that a prior scope ruling regarding a different product is not controlling, even if it is a (k)(1) source. Tianjin Mach., 29 CIT at 1225, 394 F. Supp. 2d at 1377–78. There is no indication that Commerce blindly relied upon its reasoning its Triex Scope Ruling, nor does Plaintiff focus on any obvious difference between its products and the Triex cell. In Shenyang Yuanda, the court held that Commerce misconstrued a prior scope determination as precluding consideration of any exclusionary language where that prior scope determination limited its analysis of the scope language's exclusion of the products under consideration. Shenyang Yuanda, 146 F. Supp. 3d at 1346. Here, Commerce considered the differences between the products highlighted by Plaintiff, and it determined that those differences were not material. Final Scope Ruling at 15.

[17] Commerce acknowledged Plaintiff's argument that its cells are distinguishable from those of Triex by noting that Triex cells contain "'a silicon dioxide insulator between the crystalline silicon wafer and the intrinsic and p-type and n-type amorphous thin film layers,' which contributes to its generation of electricity by 'quantum mechanical tunneling.'" Final Scope Ruling at 15 (citing Sunpreme Triex Comments at 13). However, Commerce found both differences irrelevant to the formation of a p/n junction in Sunpreme's products. See id. Plaintiff points to no record evidence indicating that this conclusion is unreasonable or unsupported by the record.

### 4.  Applicability of Thin Film Photovoltaic Products Exclusion

Since the scope language does not define the term "thin film photovoltaic products," Commerce interpreted the thin film product exclusion to apply only to those products where the crystalline silicon component of the cell did not actively contribute to the electricity generating function of the cell.  See Final Scope Ruling at 17.  Commerce clarified that the term "thin film photovoltaic products" did not mean "any" photovoltaic products containing thin films produced of amorphous silicon.  Id.  Commerce supported its interpretation by referencing the petition (k)(1) sources, which indicate that "'[t]hin film products do not use crystalline silicon.'"  Id. (citing Petitioner Additional Factual Information at Att. 26, AD PD 49–50, bar code 3481990-01–02 (June 27, 2016); Petitioner Additional Factual Information at Att. 26, AD PD 55–70, bar code 3482071-01–16 (June 27, 2016) (collectively "CVD Petition")).

Plaintiff argues that Commerce's interpretation of the exclusion for thin film products is inconsistent with the language of the Orders and contradicted by record evidence.  PI Mot. 23–29.  Specifically, Plaintiff argues that the scope language of the Orders excludes all thin film products made of specified materials and does not limit the Orders' thin film product exclusion to products of a particular substrate.[18]  Id. at 24–25.

---

[18] Plaintiff also argues that it would be illogical to provide an exclusion for "thin film products" in the scope language if thin film products cannot contain crystalline silicon as there would be no possibility of overlap between CSPVs and thin film products.  PI Mot. 22–23.  Therefore, Plaintiff argues that Commerce's interpretation, even if it is supported by the petitions, is contradicted by the plain language of the Orders.  See id.  However, exclusionary language does not merely function as an exception to affirmative scope language.  It is an integral component of the scope

(footnote continued)

However, this argument ignores that the Orders do not define the term "thin film

photovoltaic products." <u>CVD Order</u>, 77 Fed. Reg. 73,017; <u>AD Order</u>, 77 Fed. Reg 73,018.

Commerce looked to the underlying petitions, a (k)(1) source, to define this phrase.  <u>See</u>

Final Scope Ruling at 17.  Plaintiff points to no (k)(1) source that contradicts Commerce's

interpretation that thin film products do not use crystalline silicon.[19]  Moreover, Commerce

---

language, and it defines the scope.  The exclusion, as clarified by Commerce, provides that only those thin films that do not contain crystalline silicon are excluded.  Even if Commerce's interpretation of the exclusion may render it unnecessary to defining the scope in some instances, that does not make Commerce's interpretation unreasonable.  Plaintiff points to no (k)(1) source indicating that thin film products containing crystalline silicon as the electricity generating component were meant to be excluded from the Orders.

    Moreover, Commerce necessarily writes scope language in general terms.  19 C.F.R. § 351.225(a); <u>Duferco</u>, 296 F.3d at 1096.  Although the (k)(1) sources cannot substitute for the language of the order itself, <u>see</u> <u>Duferco</u>, 296 F.3d at 1097, the scope language here does not define the term "thin film products."  <u>See</u> <u>CVD Order</u>, 77 Fed. Reg. 73,017; <u>AD Order</u>, 77 Fed. Reg. 73,018.  Commerce's interpretation clarifies the Orders in a way that does not contradict the plain language or any (k)(1) source.

[19] Plaintiff argues that Commerce's reliance on the petition for the notion that thin film products do not use crystalline silicon is misplaced and referenced out of context. Sunpreme Reply Br. 4–5 (citing Final Scope Ruling at 17).  Plaintiff references the language of the petition relied upon by Commerce, which states:

> CSPV cells and modules are made from crystalline silicon.  Thin-film products do not use crystalline silicon and instead use a thin layer of a compound, such as cadmium telluride, copper indium gallium selenide, or amorphous silicon, which is sputtered or otherwise applied onto a substrate like glass.

<u>Id.</u> at 4 (citing CVD Petition at 17).

> Plaintiff argues:

> When read in context, the clause "Thin-film products do not use crystalline silicon" is an introductory clause, intended as a counterpoint to the previous declarative sentence "CSPV cells and modules are made from crystalline silicon."  However, the affirmative description of [thin] film products, omitted from the Government's quote, includes the positive elements of thin film products: "instead use a thin layer of a compound, such as cadmium telluride, copper indium gallium selenide, or *amorphous silicon*, which is sputtered or otherwise applied onto a substrate . . . ."

<u>Id.</u> at 5 (citations omitted).  Plaintiff's argument only demonstrates that excluded thin film products are defined by both positive and negative attributes.  Commerce found that, according to the

(footnote continued)

found not only that Sunpreme's products incorporate a crystalline silicon substrate, but that the crystalline silicon substrate in its cells is essential to the functioning of the complete cell because it has electrical properties.[20]  Id.  Plaintiff points to no plain language contradicting this interpretation.[21]

Commerce reasons that neither the CSPV product nor the thin film product certification standards provides a definitive means of determining whether or not an imported product is subject to the Orders.  Id. at 17.  Moreover, Commerce acknowledged the fact that the petition, a (k)(1) source, referenced industry standards to define the

petition, one of the negative attributes is that they do not contain crystalline silicon.  See Final Scope Ruling at 17 (citing CVD Petition).

Plaintiff also argues that the same sentence in the petitions cannot mean that thin film products consist entirely of non-crystalline silicon materials because that reading would require Commerce to read the next sentence in a nonsensical way.  See Sunpreme Reply Br. 5.  Plaintiff contends that reading the sentence "CSPV cells and modules made from crystalline silicon" as requiring CSPV modules to contain exclusively crystalline silicon components makes no sense because modules include other components that are part of the module but not the cell (i.e., aluminum frame, backsheet, silver paste, etc.).  See id.  That argument is misplaced because it ignores a key difference in the sentences.  A CSPV module can be "made from crystalline silicon" without being made exclusively from crystalline silicon.  A thin film product that "does not use crystalline silicon" cannot contain any crystalline silicon.

[20] Plaintiff argues that Commerce's determination to limit the thin film exclusion to products with substrates other than crystalline silicon is arbitrary because it treats some thin film products as covered by the scope of the orders while treating other thin film products with a different substrate as outside the scope.  Pl Mot. 29.  However, the Orders themselves distinguish between CSPV cells and other photovoltaic products.  See CVD Order, 77 Fed. Reg. 73,017; AD Order, 77 Fed. Reg. 73,018.  The Orders do not include non-CSPV cells and they explicitly exclude thin film products.  See CVD Order, 77 Fed. Reg. 73,017; AD Order, 77 Fed. Reg. 73,018.  Therefore, Commerce's focus on the crystalline silicon component and its functioning within the cell is not arbitrary but is an interpretation of the language of the Orders based upon permissible sources under 19 C.F.R. § 351.225(k)(1).

[21] Plaintiff also argues that there is no indication that thin film products using crystalline silicon substrates were at any time part of the investigations.  Pl Mot. 27–28.  Commerce, however, bases its interpretation on the language and (k)(1) sources.  Plaintiff does not marshall language of the Orders or (k)(1) sources indicating Commerce's interpretation of the ambiguous phrase "thin film photovoltaic products" is unreasonable.

category of thin film products, but found that these sources are not dispositive to define

the terms of the exclusion, but rather are merely illustrative.  Id. at 16–17.   Plaintiff points

to nothing in the petitions, or any other (k)(1) source, indicating that such product

certification standards were meant to be dispositive of whether a product falls within the

thin film product exclusion.   Therefore, Plaintiff has not raised a serious question that

Commerce's interpretation is unreasonable.[22]

Next, Plaintiff claims that its cells precisely meet the definition of thin film solar

products used by the International Trade Commission during the investigation because

they "are formed by depositing four different layers of ultra-thin amorphous silicon . . . on

a crystalline silicon wafer."  PI Mot. 30 (citing Exs. PI Mot. Ex. 4. at I-23 (stating that the

thin film production process varies by company technology, but, "general[ly], a thin layer

of the photosensitive material (a-Si, CdTe, CIGS, etc.) is deposited directly onto a glass,

stainless steel, or plastic substrate via physical vapor deposition, chemical vapor

deposition, electrochemical deposition, or a combination of methods.").  Plaintiff argues

that Commerce ignored the scientific evidence about its products and its production

process that established that its products meet these characteristics of thin film products

and reached its determination based on unrebutted evidence that Sunpreme's products

---

[22] Plaintiff highlights Commerce's assertion that Sunpreme's products are certified as CSPV modules as well as thin film products according to industry standards, see PI Mot. 25 (citing Final Scope Ruling at 16–17), which Plaintiff argues is contradicted by record evidence indicating that none of the modules at issue in this scope proceeding were certified under the CSPV standard. Id. at 25–26 (citing Sunpreme Reply to SolarWorld Comments at 34–35, CVD PD 77, bar code 3486320-01 (July 13, 2016)).   However, since Commerce found both the CSPV and thin film product industry standards not dispositive of the meaning of the thin film product exclusion, see Final Scope Ruling at 16–17, Commerce did not rely upon this finding.

possessed the physical characteristics of thin film products.  PI Mot. 32.  However, this argument fails to call into question the reasonableness of Commerce's interpretation of the undefined terms "thin film products" and "CSPV cells."  Commerce explained that its determination is based on an interpretation of the scope language as well as the relevant (k)(1) sources.  Final Scope Ruling at 16.  Commerce determined that it was able to interpret the language in the Orders without needing to consider (k)(2) sources, which include physical characteristics of the product.  Where Commerce may interpret the scope language based upon consulting the text as well as the relevant (k)(1) sources, its regulation permits it to do so without consulting the (k)(2) sources.  Commerce did not dispute the similarities between thin-film products and CSPV cells, but rather interpreted the term "thin film photovoltaic products" to mean cells where a crystalline silicon component does not contribute to the electricity generating function of the cell.  The record evidence cited by Plaintiff about the characteristics of its products fails to raise a significant question as to the reasonableness of that interpretation.

Finally, Plaintiff maintains that Commerce improperly based its interpretation of the scope language on anti-circumvention concerns.  PI Mot. 33–34 (citing Final Scope Ruling at 17).  Specifically, Plaintiff argues that such concerns "do not control a scope analysis and those concerns impermissibly narrowed [Commerce's interpretation of] the scope exclusion for thin film products."  Id. at 34.  However, although Commerce referenced the point that excluding all products containing amorphous silicon without further analysis could create circumvention issues, Commerce's interpretation was based on the statement in the petitions that thin film products do not use crystalline silicon, not

based upon such anti-circumvention concerns.  See Final Scope Ruling at 17.  Therefore,

Commerce referenced circumvention concerns in the context of its interpretive analysis.

Commerce did not rely upon such concerns to interpret the scope language.

## III. Balance of the Hardships

Before granting a preliminary injunction, the court must "balance the competing

claims of injury and consider the effect" of granting or denying relief on each party.  Winter,

555 U.S. at 24.  To do so, the court must "determine which party will suffer the greatest

adverse effects as a result of the grant or denial of the preliminary injunction."  Ugine-

Savoie Imphy v. United States, 24 CIT 1246, 1250, 121 F. Supp. 2d 684, 688 (2000).

The balance of the hardships tips decidedly in the government's favor here.  The

court acknowledges that Plaintiff faces likely irreparable harm without a preliminary

injunction.  Nonetheless, the balance of the hardships is a separate and distinct inquiry.

In balancing the hardships, harm to Plaintiff must be measured against harm to the

government.  See Ugine-Savoie, 24 CIT at 1250, 121 F. Supp. 2d at 688.  The

government faces a significant risk that Plaintiff will not be able to pay duties that Plaintiff

might owe without collecting cash deposits on Plaintiff's entries.  See Exs. PI Mot. Ex. 9

at ¶16.[23]  Plaintiff claims that the government can be protected by a bond, PI Mot. 15, 49,

but Plaintiff has not even attempted to show that it would be able to obtain such a bond

given its financial condition.

---

[23] Plaintiff estimates it will owe approximately [[                    ]] in cash deposits on the merchandise
the company intends to import between mid-September and December 2016.  Exs. PI Mot. Ex. 9
at ¶16.  Plaintiff asserts that [[                                                    ]] should its goods be
found to be subject to the Orders.  See PI Mot. 4.

Weighing the prospect that either Sunpreme may suffer [[                      ]] or the government will have to forgo [[            ]] in duties should Commerce's scope determination be upheld, the balance of the hardships favors Defendant in this case because Congress has already spoken to how this balance should be struck.  Commerce here is acting pursuant to a statutory regime that protects the revenue of the United States where goods are found to be subject to the terms of an antidumping or countervailing duty order even where the extent of any potential liability for the importer is uncertain.  See 19 U.S.C. § 1673b(d)(1)(B) (requiring collection of cash deposits, a bond, or other security upon affirmative preliminary determination in antidumping duty investigation); 19 U.S.C. § 1671b(d)(1)(B) (requiring collection of cash deposits, bond, or other security upon affirmative preliminary determination in countervailing duty investigation); 19 U.S.C. § 1673d(c)(1)(B) (requiring the continuation of cash deposits upon issuance of an affirmative final determination for antidumping duty investigations); 19 U.S.C. § 1671d(c)(1)(B) (requiring the continuation of cash deposits upon issuance of an affirmative final determination for countervailing subsidy investigations).  Commerce's regulations reflect this same balancing of hardships where Commerce makes a determination that goods are subject to antidumping or countervailing duties.  See 19 C.F.R. § 351.205(d) (instructing Commerce that the provisional measures established in the statute is to take the form of cash deposits, rather than bond or other security).  The statutory and regulatory antidumping and countervailing duty regime envisions that importers may have to pay cash deposits in excess of what is ultimately determined to be owed.  See 19 U.S.C. §§ 167lf, 1673f, 1677g; 19 C.F.R. § 351.205(d).  The fact that

payment of those deposits may cause irreparable harm due to the fact the company is a "start-up," and may not be in as strong a financial position as a more established company, only goes to one factor in the court's analysis.[24]

Although this Court previously enjoined cash deposits upon the showing of irreparable harm in Plaintiff's action against CBP, it did so in a case brought under 28 U.S.C. §1581(i) challenging agency action was claimed to have been contrary to the statutory and regulatory scheme. See Sunpreme, 40 CIT at __, 145 F. Supp. 3d at 1286. It is an entirely different matter to balance the hardships created where Commerce has acted within that scheme. Therefore, the balancing of the hardships tips decidedly differently in this case.

### IV. The Public Interest

For the same reasons that the balance of the hardships tips in the government's favor, the public interest is served by denying the injunction. See Union Steel v. United States, 33 CIT 614, 622, 617 F. Supp. 2d 1373, 1381 (2009) ("Accurate and effective enforcement of the trade laws serves the public interest"). Congress has, through the statutory scheme, provided for the imposition, assessment, and collection of antidumping

---

[24] Plaintiff contends that, due to its limited markets in other countries, the company could not support itself financially unless it is able to import the solar modules without making the statutorily required cash deposits. Pl Mot. 19. Even accepting Plaintiff's statements regarding the consequences of compliance on its business as true, any such consequences are not appropriate to consider in balancing the equities of either granting or denying the injunction. The government cannot be put in a worse position simply because of Plaintiff's business model or the financial immaturity of its business. Moreover, Plaintiff filed its scope ruling request on November 16, 2015. Therefore, Plaintiff has known for over ten months that its goods could be subject to the Orders. It could have taken steps during that time in anticipation of these hardships to lessen their impact.

and countervailing duties prior to a final determination by Commerce.  19 U.S.C. §§ 167lf,

1671d(c)(1)(B), 1673d(c)(1)(B), 1673f, 1677g.  Congress has charged Commerce with

implementing that scheme, and Commerce has specifically provided for the protection of

the revenue of the United States.  <u>See</u> 19 C.F.R. § 351.205(d).  The public interest is

served by allowing the system devised by Congress and implemented by the agency to

operate without disruption where, as here, Commerce acts within its authority and Plaintiff

has failed to demonstrate a likelihood of success on the merits.

Sunpreme contends that the requested injunction is in the public interest because

the company is unlawfully being required to make cash deposits on products that are

excluded from the scope of the Orders.   PI Mot. 50.   However, this situation is

contemplated by the statute and the regulations.  It speaks more to the issue of likelihood

of success on the merits.   The public interest would not be served by enjoining the

collection of cash deposits in this case, as those deposits were properly requested

pursuant to the statutory and regulatory scheme in place.[25]   <u>See</u> 19 U.S.C.

§§ 1671d(c)(1)(B), 167lf, 1673d(c)(1)(B), 1673f, 1677g; 19 C.F.R. § 351.205(d).

---

[25] Sunpreme also argues that the injunction is required "to preserve its opportunity to litigate its meritorious claim."  PI Mot. 50.  Plaintiff cites <u>Kwo Lee, Inc. v. United States</u>, 38 CIT __, 24 F. Supp. 3d 1322 (2014), to support its position that the public interest tips in its favor.  <u>See</u> PI Mot. 50 (citing <u>Kwo Lee, Inc. v. United States</u>, 38 CIT __, __, 24 F. Supp. 3d 1322, 1332 (2014)).  In <u>Kwo Lee</u>, the court implicitly relied in part upon its finding of likelihood of success on the merits to find that the public interest favored the proper execution of and compliance with the antidumping laws.  <u>See</u> <u>Kwo Lee</u>, 38 CIT at __, 24 F. Supp. 3d at 1332.   Here, Plaintiff has failed to demonstrate that the public interest will not be served by denying the injunction because Plaintiff does not demonstrate likelihood that Commerce erred in its determination.

### V.  The Collection of Cash Deposits with Respect to Entries Prior to the Initiation of the Scope Inquiry

Plaintiff claims that Commerce's instructions effectively embody two separate decisions.  See PI Mot. 46–47.  First, Plaintiff argues Commerce instructed CBP to collect cash deposits and suspend liquidation on entries on or after the initiation of the scope inquiry.  See id.  Second, Plaintiff argues Commerce's instructions, by failing to specify that CBP should not be collecting cash deposits or suspending liquidation on entries before initiation of the scope inquiry, unlawfully direct CBP to collect cash deposits on entries predating the initiation of the scope inquiry in violation of Commerce's regulations.  See id.  The court has already found that the Plaintiff has failed to make a sufficient showing to enjoin the former.  However, Defendant argues that, when entries are already suspended, "Commerce has the authority to order that suspension continue, regardless of when the scope inquiry was initiated."  Def.'s Resp. Br. 25–28 (citing 19 C.F.R. §§ 351.225(l)(1), (3)).  Here, Plaintiff has demonstrated that, in addition to it suffering likely irreparable harm, it is likely to succeed on the merits of this portion of its claim, and the balance of the hardships and public interest favor an injunction.  Therefore, the court grants Plaintiff's motion and enjoins only the collection of cash deposits, but not the suspension of liquidation, on Plaintiff's entries prior to the initiation of the scope inquiry.

In Sunpreme, the court concluded that Sunpreme was likely to succeed on its claim that CBP acted in excess of its authority when it interpreted the Orders to include Sunpreme's merchandise.  Sunpreme, 40 CIT at __, 145 F. Supp. 3d at 1296.  The court held:

> Plaintiff has shown that it is very likely to succeed on the merits because it has demonstrated that the Court has jurisdiction and that CBP acted beyond the scope of its authority in interpreting the scope of the Orders.  Plaintiff has successfully demonstrated that it is challenging CBP's ultra vires interpretation of Commerce's Orders.   It is clear that CBP interpreted ambiguous scope language rather than relying solely upon factual information that the scope language explicitly called on CBP to consider. CBP lacks the authority to interpret ambiguous scope language in the Orders.  Since the language of the Orders is insufficient to permit CBP to determine if goods are in or out of scope based upon factual determinations alone, CBP cannot interpret goods as falling within the Orders until Commerce says they are included within the scope.

Id. (citations omitted).

If the court were to decide that CBP did act ultra vires on Plaintiff's motion for judgment on the agency record in Sunpreme Inc. v. United States, Court No. 15-00315, any suspension of liquidation would be void ab initio.[26]   Therefore, Plaintiff has

---

[26] In Sunpreme, the court did not decide that any conceivable ambiguity identified by an importer would prevent CBP from collecting cash deposits on its merchandise.  Rather, the court's decision that Plaintiff was likely to succeed on the merits was based upon the narrow ground that CBP acted ultra vires by interpreting ambiguous language in the Orders.  See Sunpreme, 40 CIT at __, 145 F. Supp. 3d at 1296.  Where merchandise is covered by the plain language of an order, nothing prevents CBP from collecting cash deposits even in a case where a party claims there is ambiguity in the order.  See Xerox Corp. v. United States, 289 F.3d 792, 794 (Fed. Cir. 2002).  However, the plain language of the Orders includes both inclusionary and exclusionary language.  In this case the exclusionary clause, on its face, would not include Sunpreme's merchandise because they contain thin films of amorphous silicon.  Without a definition of the term "thin film products" in the scope language, CBP could not have given effect to the exclusionary language without concluding some products with thin films were not thin film products.  It is this interpretation of the exclusion that allowed CBP to conclude Plaintiff's merchandise fell within the scope of the Orders.

Where CBP cannot act to collect cash deposits because the plain scope language does not encompass the merchandise, Commerce has numerous routes available to resolve ambiguity and protect potential duties on merchandise that it believes are subject to an order.  First, nothing prevents CBP from bringing scope issues to the attention of Commerce, which can self-initiate a scope inquiry.  See 19 C.F.R. § 351.225(b).  In addition, interested parties that are harmed by CBP's inability to apply an order containing language that appears not to reach merchandise on

(footnote continued)

demonstrated that it is likely that Defendant's reliance on its regulations to permit the

suspension of liquidation and collection of cash deposits for all entries on which there is

a continuation of a suspension of liquidation is misplaced.

Turning to Defendant's argument, Commerce's regulations allowing the

continuation of suspension of liquidation on entries that are already suspended and

allowing the collection of cash deposits on those entries must presume that the

suspension of liquidation is lawful.  See 19 C.F.R. §§ 351.225(l)(1), (3).  Plaintiff has

demonstrated it is likely to succeed on its claim that Commerce's regulation cannot

reasonably be read to permit an ultra vires suspension of liquidation to continue.

When Commerce conducts a scope inquiry,

and the product in question is already subject to suspension of liquidation,
that suspension of liquidation will be continued, pending a preliminary or
final scope ruling, at the cash deposit rate that would apply if the product
were ruled to be included within the scope of the order.

19 C.F.R. § 351.225(l)(1).  Once Commerce issues a final scope ruling to the effect that

the product is included within the scope of the order,

Any suspension of liquidation under paragraph (l)(1) . . . of this section will
continue.  Where there has been no suspension of liquidation, [Commerce]
will instruct [CBP] to suspend liquidation and to require a cash deposit of
estimated duties, at the applicable rate, for each unliquidated entry of the
product entered, or withdrawn from the warehouse, for consumption on or
after the date of initiation of the scope inquiry.

19 C.F.R. § 351.225(l)(3).

---

its face may bring an application for a scope inquiry under 19 C.F.R. § 351.225(c).  Moreover, in
either circumstance, Commerce's regulations permit it to act quickly to determine that a product
falls within the scope of an order based solely upon the application or based on the (k)(1) factors
where the ambiguity in scope language may be easily resolved.  See 19 C.F.R. § 351.225(d).

Plaintiff argues here that the suspension of liquidation and imposition of antidumping cash deposits may only take effect on or after the date of initiation of the scope inquiry. Pl Mot. 46 (citing <u>AMS Assocs., Inc. v. United States</u>, 737 F.3d 1338, 1344 (Fed. Cir. 2013)).  In <u>AMS Assocs.</u>, the Court of Appeals for the Federal Circuit held that, where an unclear order renders a product not subject to an existing order and Commerce clarifies ambiguous scope language to determine that the merchandise is subject to the antidumping order, "the suspension of liquidation and imposition of antidumping cash deposits may not be *retroactive* but can only take effect 'on or after the date of the initiation of the scope inquiry.'"  <u>AMS Assocs.</u>, 737 F.3d at 1344 (citing 19 C.F.R. § 351.225(l)(2), which has identical language to that quoted above in 19 C.F.R. § 351.225(l)(3)).  Although in <u>AMS Assocs.</u>, Commerce issued corrected liquidation instructions explicitly instructing CBP to suspend liquidation retroactively, <u>see</u> <u>id.</u> at 1341, the Court of Appeals' holding did not depend upon that affirmative act. <u>See</u> <u>id.</u> at 1344.  Defendant points to no authority other than CBP's determination to require Plaintiff to enter its merchandise as subject to the Orders for the collection of cash deposits and suspension of liquidation.   Since Commerce initiated its scope inquiry on December 30, 2015, <u>see</u> Final Scope Ruling at 2, Plaintiff has demonstrated that it is likely that Commerce's regulations only permit Commerce to order the suspension of liquidation and collection cash deposits prospectively from the date of initiation of the scope inquiry.  19 C.F.R. § 351.225(l)(3); <u>AMS Assocs.</u>, 737 F.3d at 1344.

Defendant argues that, unlike in <u>AMS Assocs.</u>, here Sunpreme's entries were already suspended prior to the date Commerce initiated its scope inquiry.  Def.'s Resp.

Br. 27–28.  Therefore, Defendant interprets 19 C.F.R. §§ 351.225(l)(1) and (3) to permit

the suspension of liquidation to continue and the collection of cash deposits on all entries

for which liquidation was suspended.  Id. (citing 19 C.F.R. §§ 351.225(l)(1), (3)).  Plaintiff

has demonstrated that it is likely that Commerce acted contrary to law because

Commerce's regulation cannot reasonably be interpreted to permit the suspension of

liquidation and collection of cash deposits to continue where they resulted from CBP's

ultra vires interpretation of the scope language.  Such an interpretation is unreasonable

because it would permit the circumvention of Commerce's regulations by allowing CBP

to require a party to enter goods as subject to the Orders before Commerce has

interpreted ambiguous scope language to the effect that goods are subject to the Orders.

Nor can either portion of Commerce's regulation reasonably be interpreted to permit

Commerce to require cash deposits prior to the date of initiation of the scope inquiry

merely because CBP suspended liquidation before that date without authority to do so.

Plaintiff has therefore demonstrated that it is likely that CBP's purported suspension of

liquidation was void ab initio.

Defendant argues that Commerce may liquidate all unliquidated entries pursuant

to its final scope ruling regardless of when Commerce issued its final scope ruling.  See

Def.'s Resp. Br. 28 (citing Ugine & ALZ Belgium v. United States, 551 F.3d 1339, 1349

(Fed. Cir. 2009) ("Ugine II")).  Ugine II is inapposite, and Defendant misconstrues its

holding.  In Ugine, the Court of Appeals held that Commerce may not impose antidumping

duties on unliquidated entries it determined were not subject to an antidumping duty order

merely because no objection was raised during the course of a subsequent administrative

review.  See Ugine II, 551 F.3d at 1349.  In Ugine II, the Court of Appeals for the Federal

Circuit did not confront an ultra vires interpretation by CBP nor did it interpret Commerce's

scope regulations to permit retroactive suspension of liquidation and collection of cash

deposits on entries that were suspended by CBP acting contrary to law.  See id. at 1349.

Therefore, the combination of the court's prior ruling in Sunpreme Inc. v. United

States, Court No. 15-00315, and Commerce's regulations make it likely that Plaintiff will

succeed in demonstrating that Commerce was without authority to order the suspension

of pre-initiation entries or to collect cash deposits on such entries.[27]  Commerce may not

continue CBP's suspension of liquidation pursuant to its regulation where Plaintiff has

demonstrated it is likely CBP acted contrary to law.  The court likewise already found that

the public interest and the balance of the hardships favor Plaintiff on this portion of its

claim.  See Sunpreme, 40 CIT at __, 145 F. Supp. 3d at 1296–1298.  Accordingly, since

Plaintiff has demonstrated that all four factors favor granting a preliminary injunction

preventing Commerce from collecting cash deposits on entries prior to initiation of the

scope inquiry, this portion of Plaintiff's motion is granted.

---

[27] Commerce's liquidation instructions, see Corrected Sunpreme Customs Instructions, AD PD 75, bar code 3505144-01 (Sept. 12, 2016); Corrected Sunpreme Customs Instructions, CVD PD 81, bar code 3505147-01 (Sept. 12, 2016), permit CBP to collect cash deposits on entries prior to December 30, 2015 that were enjoined by the temporary restraining order and PI given by the court in Plaintiff's action challenging CBP's collection of cash deposits, which is no longer in effect. See Sunpreme Inc. v. United States, 40 CIT at __, 145 F. Supp. 3d at 1299.

   USCIT Rule 65(c) requires that the court may issue a PI "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by a party found to have been wrongfully enjoined."  USCIT R. 64(c).  The court considers a bond of [[          ]] appropriate security to protect Defendant in the event it has been wrongfully enjoined from collecting cash deposits on Plaintiff's entries from the date between the date the temporary restraining order and December 30, 2015.

However, the court does not enjoin the continuation of suspension of liquidation on all entries whose liquidation is suspended on or after Commerce's initiation of the scope inquiry because Plaintiff has made no showing that suspension of liquidation will cause it irreparable harm or that the balance of the hardships or public favor such an injunction.

## CONCLUSION

Although Plaintiff has shown that it is likely to suffer irreparable harm without an injunction, it has failed to raise a serious challenge to the reasonableness of Commerce's interpretation of the scope language.  Moreover, the balance of hardships and the public interest tip decidedly against enjoining the collection of cash deposits on entries subsequent to the initiation of the scope inquiry in this case.  However, Plaintiff has shown that it is likely that Commerce lacks the authority to suspend liquidation on entries or to collect cash deposits on entries prior to the initiation of its scope inquiry.  Therefore, Plaintiff's motion for an injunction prohibiting Commerce from instructing CBP to collect and prohibiting CBP from collecting cash deposits prior to the initiation of the scope inquiry is granted.  Therefore, it is

**ORDERED** that Plaintiff's motion for a preliminary injunction is denied in part and granted in part; and it is further

**ORDERED** that Defendant, United States, together with its delegates, officers, agents, servants, and employees of the International Trade Administration of the U.S. Department of Commerce and the U.S. Department of Homeland Security, U.S. Customs and Border Protection, shall be enjoined during the pendency of this action from requiring

**PUBLIC VERSION**

Plaintiff to pay cash deposits on entries of solar modules containing bi-facial thin film cells

made with amorphous silicon from the People's Republic of China that are the subject of

this action entered or withdrawn from warehouse on or before December 30, 2015; and

it is further

      **ORDERED** that, as a condition to the grant of preliminary injunctive relief, Plaintiff

shall provide assurity that it will furnish a bond in the amount of [[         ]] subject to the

approval of the Clerk of the Court, to pay the costs or damages as may be incurred or

suffered in the event that Defendant has been wrongfully enjoined; and it is further

      **ORDERED** that this preliminary injunction shall expire upon the entry of a final and

conclusive court decision in this matter.

/s/ Claire R. Kelly
Claire R. Kelly, Judge

Dated: October 5, 2016
      New York, New York