Slip Op. 17-116

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **SUNPREME INC.,** | |
| **Plaintiff,** | |
| **v.** | |
| **UNITED STATES,** | **Before: Claire R. Kelly, Judge** |
| **Defendant,** | **Court No. 16-00171** |
| **and** | |
| **SOLARWORLD AMERICAS, INC.,** | |
| **Defendant-Intervenor.** | |

## OPINION AND ORDER

[Sustaining the U.S. Department of Commerce's determination that Sunpreme Inc.'s imported bifacial solar modules are subject to the antidumping duty and countervailing duty orders covering certain crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China, but granting Plaintiff's motion for judgment on the agency record challenging the terms of the liquidation instructions issued in connection with the U.S. Department of Commerce's affirmative scope determination and entering judgment for Plaintiff on that claim.]

Dated: August 29, 2017

John Marshall Gurley and Diana Dimitriu-Quaia, Arent Fox LLP, of Washington, DC, argued for plaintiff.  With them on the brief were Nancy Aileen Noonan and Aman Kakar.

Justin Reinhart Miller, Senior Trial Counsel, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, for defendant.  With him on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel on the brief was Mercedes C. Morno, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Timothy C. Brightbill and Usha Neelakantan, Wiley Rein, LLP, of Washington, DC, argued for defendant-intervenor.

Kelly, Judge:  This action is before the court on Plaintiff's USCIT Rule 56.2 motion for judgment on the agency record challenging the United States Department of Commerce's ("Commerce") determination that Plaintiff's solar modules are subject to antidumping and countervailing duty orders covering certain crystalline silicon photovoltaic ("CSPV") cells, whether or not assembled into modules, from the People's Republic of China (collectively "Orders").  See Pl.'s Mot. J. Agency R., Dec. 5, 2016, ECF No. 75-1 ("Pl.'s Mot."); see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the People's Republic of China: Final Ruling in the Scope Inquiry, Sept. 14, 2016, ECF No. 28-4 ("Final Scope Ruling"); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, From the People's Republic of China, 77 Fed. Reg. 73,017 (Dep't Commerce Dec. 7, 2012) (countervailing duty order) ("CVD Order"); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, From the People's Republic of China, 77 Fed. Reg. 73,018 (Dep't Commerce Dec. 7, 2012) (amended final determination of sales at less than fair value and antidumping duty order) ("ADD Order").  Additionally, Plaintiff challenges as contrary to law Commerce's liquidation instructions to U.S. Customs and Border Protection ("Customs" or "CBP"), which ordered CBP to collect cash deposits and to suspend liquidation on entries entered prior to the initiation of the scope inquiry that culminated in Commerce's issuance of the Final Scope Ruling.[1]  Pl.'s Mot.; see also

---

[1] Plaintiff brings its challenge to Commerce's liquidation instructions within its USCIT Rule 56.2 motion for judgment on the agency record challenging Commerce's determination that Plaintiff's

(footnote continued)

Message Number 6214307, AD PD 74, bar code 3505143-01 (Sept. 1, 2016), Message

Number 6214307, CVD PD 80, bar code 3505146-01 (Sept. 1, 2016) (collectively

"Liquidation Instructions"); Message Number 6246309, AD PD 75, bar code 3505144-

01 (Sept. 2, 2016), Message Number 6246309, CVD PD 81, bar code 3505147-01 (Sept.

2, 2016) (collectively "Corrected Liquidation Instructions").[2]  For the reasons that follow,

the court denies Plaintiff's motion for judgment on the agency record and sustains

Commerce's final scope determination that Plaintiff's imported solar modules are subject

to the Orders.  However, the court grants Plaintiff's motion for judgment on the agency

record on its claim challenging as contrary to law Commerce's liquidation instructions

directing CBP to continue suspension of liquidation and to collect cash deposits with

respect to entries prior to the initiation of the scope inquiry.  Accordingly, the court directs

Commerce to issue new liquidation instructions consistent with this decision.

## BACKGROUND

Plaintiff, Sunpreme Inc. ("Sunpreme"), is a U.S.-based importer of solar modules

manufactured by Jiawei Solarchina (Shenzen) Co., Ltd. ("Jiawei Shenzen") in the

People's Republic of China.  See Pl.'s Mem. Supp. Mot. J. Agency R. 3, Dec. 5, 2016,

---

imported solar modules are subject to the Orders.  See Pl.'s Mot.  As discussed in further detail in the discussion of the Court's jurisdiction over Plaintiff's claim, the court construes Plaintiff's challenge as a motion for judgment on the agency record over which the Court has jurisdiction under 28 U.S.C. § 1581(i).  USCIT Rule 56.2 only allows for judgment on the agency record for an action described in 28 U.S.C. § 1581(c).  See USCIT R. 56.2.  Therefore, the court converts Plaintiff's motion to a motion for judgment on the agency record brought pursuant to USCIT Rule 56.1.

[2] On September 14, 2016, Defendant filed indices to the confidential and public administrative records for its antidumping and countervailing duty scope proceedings.  Those administrative records can be found at ECF Nos. 28-2 and 28-3, respectively.  All further documents from the administrative records may be located in those appendices.

ECF No. 75 ("Sunpreme Br.") (incorporating by reference Pl.'s Mot. Prelim. Inj. and Mem.

P & A. Supp. Thereof, Sept. 8, 2016, ECF No. 21 ("Mot. PI")); Compl. ¶ 6, 20, Aug. 26,

2016, ECF No. 2 ("Compl.").   Plaintiff imports solar modules, which it describes as

containing bi-facial solar cells with "an innovative thin film technology, the Hybrid Cell

Technology, developed and owned by Sunpreme." Compl. ¶ 22.   Plaintiff designs,

develops, and tests the imported solar cells that form the imported solar modules at its

facility in California.  Id.  Plaintiff avers that all of its solar modules that are the subject of

Commerce's Final Scope Ruling

> consist of solar cells made with amorphous silicon thin films and are certified
> by an [industry certification body] as thin film modules under the
> international standard IEC 61646: 2008 which covers "Thin film terrestrial
> photovoltaic (PV) modules.  Design qualification and type approval."

Compl. ¶ 21.   Plaintiff alleges that its cells are "made of several layers of amorphous

silicon less than one micron in thickness, deposited on both sides of a substrate

consisting of a crystalline silicon wafer."  Compl. ¶ 23.

Plaintiff alleges its cells have a p/i/n junction consisting of "thin film p-i-(wafer

substrate)-i-n junctions, formed by four amorphous silicon thin film depositions."  Compl.

¶ 24; see also Sunpreme Br. 28.  Plaintiff asserts that "the junction is made by the layers

of p/i and i/n amorphous silicon on both the front and the back of the substrate, such that

the junction is formed on the wafer and inside the thin film layers."   Compl. ¶ 25;

Sunpreme Br. 28.  Further, Plaintiff claims it uses a

> blank crystalline silicon wafer as a substrate for the thin films in order to
> improve the mechanical reliability of the modules.   That wafer is not
> processed by doping, does not contain a p/n junction, nor is it otherwise
> processed to become a[ ] CSPV cell.  Without the amorphous silicon layers,
> the substrate is a blank silicon wafer, not a CSPV cell.

Compl. ¶ 26; see also Sunpreme Br. 28.

On December 7, 2012, Commerce published the Orders.  See CVD Order, 77

Fed. Reg. at 73,017; ADD Order, 77 Fed. Reg. at 73,018.  The scope language of the

Orders is identical, and provides:

> The merchandise covered by this order is [CSPV] cells, and modules, laminates and panels, consisting of [CSPV] cells, whether or not partially or fully assembled into other products, including but not limited to, modules, laminates, panels and building integrated materials.
> This order covers [CSPV] cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.
> . . .
> Excluded from the scope of this order are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS).

CVD Order, 77 Fed. Reg. at 73,017; ADD Order, 77 Fed. Reg. at 73,018.

On December 11, 2012, Commerce notified CBP of the CVD Order and instructed

CBP, effective December 6, 2012, to require cash deposits equal to the subsidy rates in

effect at the time of entry.  See Pl.'s Mot. Prelim. Inj. and Mem. P. & A. Supp. Thereof

Exs. Ex. 7, Sept. 8, 2016, ECF No. 21-1.  On December 21, 2012, Commerce notified

CBP of the ADD Order and instructed CBP, effective December 7, 2012, to require a cash

deposit or the posting of a bond equal to the dumping margins in effect at the time of

entry.  See Pl.'s Mot. Prelim. Inj. and Mem. P. & A. Supp. Thereof Exs. Ex. 6, Sept. 8,

2016, ECF No. 21-1.  The instructions issued in connection with the ADD Order provided

an exporter-specific antidumping duty rate of 13.94 percent for Jiawei Shenzhen, the

manufacturer of the solar panels imported by Sunpreme.  See id.

Prior to approximately April of 2015, Plaintiff had been entering its modules as ordinary consumption entries without depositing antidumping or countervailing duties. See Def.'s Corrected Mem. Resp. Pl.'s Mot. Prelim. Inj. 4, Sept. 27, 2016, ECF No. 42 ("Def.'s Resp. PI"); see generally Sunpreme Inc. v. United States, 40 CIT __, __ 145 F. Supp. 3d 1271, 1279 (2016) ("Sunpreme I").  CBP instructed Plaintiff to file its entries as type "03," the type of entries subject to antidumping and countervailing duties.  See Def.'s Resp. PI 4; see generally Sunpreme I, 40 CIT at __, 145 F. Supp. 3d at 1279.  Plaintiff complied with CBP's instructions.  See Mot. PI 12; see generally Sunpreme I, 40 CIT at __, 145 F. Supp. 3d at 1281.  As a result of Plaintiff's entry of its merchandise as type "03" CBP began collecting cash deposits, and liquidation of these entries was suspended by operation of law.[3]

On November 16, 2015, Plaintiff filed an application for a scope ruling requesting that Commerce find Plaintiff's solar modules outside  the  scope of the Orders.  See Request for a Scope Ruling on Solar Modules With Bi-Facial Thin Film Cells, AD PD 1–6, bar codes 3417556-01–06 (Nov. 16, 2015); Request for a Scope Ruling on Solar Modules With Bi-Facial Thin Film Cells, CVD PD 1–6, bar codes 3417582-01–06 (Nov. 16, 2015) (collectively "Sunpreme Scope Ruling Request").  Plaintiff requested Commerce  issue a scope ruling on an expedited basis due to financial difficulties the company was

---

[3] Plaintiff challenged CBP's determination requiring it to enter its imported modules as type "03" entries subject to antidumping and countervailing duties prior to the initiation of a scope inquiry in a separate action.  See Sunpreme Inc. v. United States, Court No. 15-315.  In that action, the court held that CBP lacked authority to suspend liquidation and order the collection of cash deposits on entries prior to the initiation of a scope inquiry by Commerce.  Sunpreme Inc. v. United States, 40 CIT __, __, 190 F. Supp. 3d 1185, 1202 (2016).  The court further held that CBP's collection of cash deposits on Plaintiff's imports was contrary to law because CBP lacked authority to interpret ambiguous scope language in the Orders.  Id., 40 CIT at __, 190 F. Supp. 3d at 1196.

experiencing.   Sunpreme Scope Ruling Request at 2; see also Compl. ¶28.   On December 30, 2015, Commerce initiated a  formal scope inquiry.   See Scope Inquiry Initiation on Photovoltaic Modules Imported by Sunpreme, AD PD 9, bar code 3428728-01 (Dec. 30,  2015); Scope Inquiry Initiation on Photovoltaic Modules Imported by Sunpreme, CVD PD  15, bar code 3428730-01 (Dec. 30, 2015).

On June 17, 2016, Commerce placed a final ruling in a scope inquiry involving the applicability of the Orders to Triex photovoltaic cells manufactured by Silevo, Inc. on the  record of this scope proceeding.   See Memo re: Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, From the People's Republic of China: Request  for Additional Factual Information and Comments in Sunpreme Scope Inquiry at Att., AD  PD 29, bar code 3479321-01 (June 17, 2016); Memo re: Crystalline Silicon Photovoltaic  Cells, Whether or Not Assembled into Modules, From the People's Republic of  China:  Request for Additional Factual Information and Comments in Sunpreme Scope Inquiry at  Att., CVD  PD  35,  bar  code  3479320-01  (June  17, 2016) (collectively "Triex Scope Ruling").   In that determination, Commerce found the Triex solar cell to be covered by the  scope of the Orders.   See Triex Scope Ruling at 38.   Commerce invited interested parties to submit additional factual information and comments to distinguish the relevant Sunpreme product from the  Triex product.   Memo re: Crystalline Silicon Photovoltaic Cells, Whether or Not  Assembled into Modules, From the People's Republic of China: Request for Additional  Factual Information and Comments in Sunpreme Scope Inquiry at 1, AD PD 29, bar code  3479321-01 (June 17, 2016); Memo re: Crystalline Silicon Photovoltaic Cells, Whether or  Not Assembled into Modules, From  the  People's  Republic  of  China:  Request  for   Additional Factual

Information and Comments in Sunpreme Scope Inquiry at 1, CVD PD  35, bar code 3479320-01 (June 17, 2016).

On July 29, 2016, Commerce issued the Final Scope Ruling in which it determined that Sunpreme's imported solar modules are subject to the Orders based on the language of the Orders and the criteria in 19 C.F.R. § 351.225(k)(1).[4]  See Final Scope Ruling at 12–17.  Commerce considered the plain language of the Orders and determined that the scope language covers products that: "(1) are CSPV cells, (2) are at least 20 micrometers [("μm")] thick, (3) contain a p/n junction, and (4) are excluded thin film products."  Final Scope Ruling at 13.  Relying upon the plain language of the Orders and its analysis in the Triex Scope Ruling, Commerce concluded that Plaintiff's products had all of the characteristics of in-scope merchandise, and Commerce further determined that Sunpreme's merchandise was not excluded by the Order's language excluding thin film photovoltaic products.  Id. at 18.  Because Commerce determined that its analysis of the language of the Orders and the sources enumerated under 19 C.F.R. § 351.225(k)(1) are dispositive as to the meaning of ambiguous scope language, Commerce determined that it did not need to consider the criteria under 19 C.F.R. § 351.225(k)(2) or the parties' comments on how those criteria might help Commerce interpret the scope language of the Orders.  Id. at 19.

---

[4] Commerce's regulations provide that, where Commerce issues a scope ruling to clarify the scope of an antidumping or countervailing duty order with respect to particular products, Commerce will take into account, in addition to the scope language, the descriptions of the merchandise contained in: (1) the petition; (2) the initial investigation; (3) and past determinations by Commerce, including prior scope determinations.  19 C.F.R. § 351.225(k)(1) (2015).

On August 1, 2016, Commerce notified CBP that Plaintiff's merchandise was within the scope of the Orders and instructed Customs to "[c]ontinue to suspend liquidation of entries of solar cells from the [People's Republic of China ("PRC")], including the bifacial solar products imported by Sunpreme . . . subject to the antidumping [and countervailing] duty order[s] on solar cells from the PRC." Liquidation Instructions. On September 2, 2016, Commerce issued messages to Customs correcting its prior instructions regarding suspension of liquidation. The corrected messages instruct Commerce to

> [c]ontinue to suspend liquidation of entries of merchandise subject to the antidumping [and countervailing] duty order[s] on solar cells from the PRC. Accordingly, because the bifacial solar products imported by Sunpreme . . . are subject to the antidumping [and countervailing] duty order[s] on solar cells from the PRC, for entries of such merchandise that are currently suspended from liquidation, continue to suspend those entries from liquidation. For entries of bifacial solar products imported by Sunpreme . . . that are not already suspended from liquidation, begin suspension and collect cash deposits at the applicable rate for entries that entered or were withdrawn from warehouse for consumption on or after 12/30/2015.

Corrected Liquidation Instructions.

On September 8, 2016, Sunpreme filed a motion for a preliminary injunction seeking to enjoin Defendant, together with its delegates, officers, agents, servants, and employees of CBP, from requiring Sunpreme to pay cash deposits and enter its solar modules as subject to the Orders in accordance with Commerce's liquidation instructions while this action is considered. See Mot. PI. The court denied Plaintiff's motion for a preliminary injunction seeking to enjoin CBP from collecting cash deposits on entries entered or withdrawn from warehouse on or after initiation of the Final Scope Ruling. Sunpreme Inc. v. United States, 40 CIT __, __, 181 F. Supp. 3d 1322, 1326 (2016)

("Sunpreme II").  However, the court enjoined Commerce from ordering CBP to collect cash deposits and enjoined CBP from collecting cash deposits on entries entered or withdrawn from warehouse prior to Commerce's initiation of the scope inquiry that is the subject of this challenge until the entry of a final and conclusive court decision in this matter. Id.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over Plaintiff's challenge to Commerce's scope determination pursuant to Section 516A of the Tariff Act of 1930,[5] as amended, 19 U.S.C. § 1516a(a)(2)(B)(vi) and 28 U.S.C. § 1581(c) (2012), which grant the court authority to review actions contesting scope determinations that find certain merchandise to be within the class or kind of merchandise described in an antidumping or countervailing duty order. See 19 U.S.C. § 1516a(a)(2)(B)(vi); 28 U.S.C. § 1581(c) (2012).  The court must "hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C. § 1516a(b)(1)(B)(i).

Plaintiff argues that the Court possesses jurisdiction over its claim challenging Commerce's liquidation instructions under 28 U.S.C. § 1581(c).  See Sunpreme Suppl. Br. Proper Jurisdictional Basis Hearing Pl.'s Claim Challenging Liquidation Instructions 2–6, Aug. 11, 2017, ECF No. 111 ("Sunpreme Suppl. Br.").  Defendant argues that "Sunpreme's challenge to the [liquidation] instructions (Count VI of the Complaint)

---

[5] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of the U.S. Code, 2012 edition.

represents a challenge to the administration and enforcement of the [Final] Scope Ruling.

Accordingly . . . the proper jurisdictional basis for the Court to review Sunpreme's claim

is 28 U.S.C. § 1581(i)—and not subsection 1581(c)."  Def.'s Suppl. Br. Resp. Court's July

24, 2017 Order, and Mot. Dismiss Count VI Compl. Lack Subject Matter Jurisdiction

Under 28 U.S.C. § 1581(c) 6–7, Aug. 11, 2017, ECF No. 110 ("Def.'s Suppl. Br.").

However, Defendant does not object to the Court permitting Sunpreme to amend its

pleadings to invoke 28 U.S.C. § 1581(i) because Plaintiff would be capable of

commencing a separate action to challenge Commerce's liquidation instructions and

consolidating it with this action.  Id. at 7.  See id.  SolarWorld supports Defendant's

position.  See Def.-Intervenor SolarWorld Americas, Inc. Suppl. Br., Aug. 11, 2017, ECF

No. 111.  Plaintiff also argues in the alternative that, if the court found jurisdiction proper

under 28 U.S.C. 1581(i), Sunpreme should be allowed to amend its complaint to assert

jurisdiction over its claim under 28 U.S.C. § 1581(i) (2012).  See Sunpreme Suppl. Br. 7.

For the reasons that follow, the Court has jurisdiction over the Plaintiff's challenge to the

liquidation instructions issued by the U.S. Department of Commerce following the scope

determination under review in this action pursuant to 28 U.S.C. § 1581(i) (4).[6]

---

[6] Plaintiff brought its claim challenging Commerce's liquidation instructions issued incident to, but not addressed within the context of Commerce's scope determination, pursuant to 19 U.S.C. § 1516a(a)(2)(B)(vi).  See Compl. ¶ 3. Section 1516a(a)(2)(B)(vi) of Title 19 of the United States Code makes a determination as to whether a particular type of merchandise is within the class or kind of merchandise described in an existing finding of dumping or antidumping or countervailing duty order reviewable by the Court.  See 19 U.S.C. § 1516a(a)(2)(B)(vi).  As a result, Plaintiff claimed the Court has jurisdiction over this claim under 28 U.S.C. § 1581(c), which grants the Court exclusive jurisdiction of any civil action commenced under 19 U.S.C. § 1516a.  See Compl. ¶ 3; see also 19 U.S.C. § 1516a(a)(2)(B)(vi).

(footnote continued)

In addition to the enumerated jurisdictional bases provided for in the Court's jurisdictional statute, the Court has exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law providing for "tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue," see 28 U.S.C. § 1581(i)(2) (2012), and "administration and enforcement" with respect to laws providing for such tariffs, duties, fees, or other taxes and the "administration and enforcement" of claims that can be challenged under 28 U.S.C. § 1581(c), see 28 U.S.C. § 1581(i)(4) (2012).

Sunpreme's challenge to the liquidation instructions issued by Commerce is a challenge to Commerce's administration and enforcement of the Final Scope Ruling, and not to the substance of the Final Scope Ruling itself. See Compl. ¶ 71 (stating that "any suspension should have commenced as of the date of initiation of the scope inquiry or upon Commerce's finding that the Sunpreme bifacial solar product[s] are within the scope of the [antidumping and countervailing duty orders]"). Jurisdiction is improper under § 1581(c), as the challenge to the instructions does not relate to the review the scope determination issued pursuant to 19 U.S.C. 1516a, over which the Court has jurisdiction

---

On July 24, 2017, the court held a teleconference to request that the parties address whether and, if so, on what jurisdictional basis the Court could hear Plaintiff's challenge to Commerce's liquidation instructions. See Teleconference, July 24, 2017, ECF No. 105. Following the teleconference, the court ordered that the parties submit supplemental briefing addressing the jurisdictional basis for the Court to decide Plaintiff's claim challenging Commerce's liquidation instructions. See Order, July 24, 2017, ECF No. 107. The parties submitted supplemental briefs on August 11, 2017. See Def.'s Suppl. Br. Resp. Court's July 24, 2017 Order, and Mot. Dismiss Count VI Compl. Lack Subject Matter Jurisdiction under 28 U.S.C. § 1581(c), Aug. 11, 2017, ECF No. 110; Def.-Intervenor SolarWorld Americas, Inc.'s Suppl. Br., Aug. 11, 2017, ECF No. 111; Suppl. Br. Proper Jurisdictional Basis Hearing Pl.'s Claim Challenging Liquidation Instructions, Aug. 11, 2017, ECF No. 112.

under § 1581(c).  Commerce did not determine within its Final Scope Ruling what entries should be subject to suspension and liquidation or cash deposits.  Nor does the record indicate that any party provided comments on the propriety of issuing liquidation instructions that applied retroactively to entries that entered prior to the initiation of the scope inquiry.   Therefore, Commerce issued its liquidation instructions in the administration and enforcement of its Final Scope Ruling and not as a part of that determination.

Sunpreme argues that, where a plaintiff claims harm from liquidation instructions that were a direct result of a scope determination, the true nature of the challenge relates to the scope ruling itself.  See Sunpreme Suppl. Br. 3.  In support of its argument, Sunpreme cites cases holding that the Court possesses jurisdiction to review a challenge that stems from a scope ruling under 28 U.S.C. § 1581(c).  See id. at 4–6 (citing AMS Assocs., Inc. v. United States, 36 CIT __, 881 F. Supp., 2d 1374 (2012) ("AMS I"); United Steel Fasteners, Inc. v. United States, 41 CIT __, Slip Op. 17-2 (2017); Ethan Allen Operations, Inc. v. United States, 39 CIT __, 121 F. Supp. 3d 1342 (2015)).  As an initial matter, in the cases cited by Sunpreme, no party challenged the jurisdictional basis for the Court to hear the challenge in question, and none of the holdings in the cases cited by Sunpreme addressed the propriety of hearing the challenges under 28 U.S.C. § 1581(c).  Moreover, all of these cases are distinguishable in that Commerce addressed the issue of retroactivity of its scope determination in the determination being reviewed

by the Court pursuant to 19 U.S.C. § 1516a and 28 U.S.C. § 1581(c).[7]  Here, Commerce

did not address the issue of retroactivity in its Final Scope Ruling.

Sunpreme also argues that jurisdiction is not proper under § 1581(i) because the

Court only has jurisdiction under § 1581(i) where Commerce's liquidation instructions are

erroneous or contrary to the final scope ruling.  Sunpreme Suppl. Br. 6 (citing Shinyei

Corp. of Am. v. United States, 355 F.3d 1297, 1304–05 (Fed. Cir. 2004); Consol. Bearings

Co. v. United States, 348 F.3d 997, 1002 (Fed. Cir. 2003)).  Although Sunpreme correctly

points out that both cases upon which it relies involved liquidation instructions that were

erroneous or contrary to the final scope ruling, nothing in the holding of either case limits

---

[7] In AMS I, Commerce concluded during the course of its first administrative review that plaintiff's goods were subject to the antidumping order in question pursuant to a substantial transformation analysis.  AMS I, 36 CIT at __, 881 F. Supp. 2d at 1376.  Thereafter, in the course of conducting its second administrative review under the same antidumping order, Commerce retroactively suspended liquidation of Plaintiff's entries made during the second administrative review period.  See id., 36 CIT at __, 881 F. Supp. 2d at 1376–77.  Plaintiff challenged Commerce's issuance of liquidation instructions, which were addressed and defended by Commerce within the context of its final determination of the second administrative review.  See id., 36 CIT at __, 881 F. Supp. 2d at 1377–78.

In United Steel Fasteners, petitioner requested in its request for administrative review that Commerce instruct CBP to suspend liquidation and require cash deposits for all of respondents' entries retroactive to the first day of the administrative review period.  United Steel Fasteners, 41 CIT at __, Slip Op. 17-2 at 6.  Commerce also determined within its final determination that "retroactive suspension of liquidation was reasonable because it had not initiated a scope inquiry under 19 C.F.R. § 351.225(3)."  Id., 41 CIT at __, Slip Op. 17-2 at 6–7.

In Ethan Allen, the court noted that it has, at least, a colorable claim of jurisdiction under § 1581(c) over plaintiff's challenge to Commerce's liquidation instructions that stem directly from Commerce scope ruling and remand results.  Ethan Allen, 39 CIT at __, 121 F. Supp. 3d at 1352 n. 5.  However, in its decision, the court explicitly noted that "Commerce's *Remand Results* specifically address the issue of suspension of liquidation, indicating that a § 1581(c) may be the proper method to challenge not only the *Scope Ruling* and *Remand Results*, but also the liquidation instructions deriving therefrom."  Id.  Therefore, it is apparent that the court relied in part on the notion that Commerce addressed the retroactivity of its liquidation instructions in its remand results to determine that the claim of jurisdiction under § 1581(c) is colorable.  See id.

the Court's jurisdiction under § 1581(i) to circumstances where Commerce acts erroneously or inconsistently with its own determination.[8]

Although Defendant moves to dismiss Plaintiff's challenge to Commerce's liquidation instructions pursuant to USCIT Rule 12(b)(1), over which Plaintiff pled the Court had jurisdiction pursuant to 28 U.S.C. § 1581(c), Defendant does not object to Plaintiff amending its complaint to bring the same claim under § 1581(i).  See Def.'s Suppl. Br. 7.  Even if Sunpreme has explicitly invoked § 1581(c), the court may construe the allegations of a pleading as presenting a claim under § 1581(i) incident to its authority to view the allegations in the pleadings liberally and in the light most favorable to Plaintiff. See Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1583 (Fed. Cir. 1993) (stating that allegations can be taken as true and construed in a light most favorable to the complainant where a Rule 12(b)(1) motion challenges the Court's subject matter jurisdiction based on the sufficiency of the allegations in the pleadings).  In light of Defendant's lack of

---

[8] In Shinyei, the Court of Appeals for the Federal Circuit noted that liquidation instructions issued incident to an antidumping duty administrative review that are contrary to Commerce's determination are not antidumping duty determinations reviewable under 19 U.S.C. § 1516a over which the Court would have jurisdiction under 28 U.S.C. § 1581(c).  Shinyei, 355 F.3d at 1309. Although not part of the Court of Appeals holding, the Court of Appeals remarked that the Court had jurisdiction over such an action under 28 U.S.C. § 1581(i).  But nothing in the decision indicates that the decision relied on the notion that Commerce's instructions are inconsistent with its own determination in order for the Court to have jurisdiction over such a claim under § 1581(i). Likewise, nothing in the Court of Appeals for the Federal Circuit's holding in Consol. Bearings indicates that the Court's jurisdiction over a claim challenging Commerce's liquidation instructions issued incident to the final results in an administrative review is limited to circumstances where Commerce acts erroneously or inconsistently with its final results.  Consol. Bearings, 348 F.3d at 1002.

Moreover, both cases involved determinations made in the course of administrative reviews of antidumping orders.  See Shinyei, 355 F.3d at 1301–02; Consol. Bearings, 348 F.3d at 1001.  Therefore, neither case holds that there are any limitations upon the Court's jurisdiction over a challenge to liquidation instructions issued incident to a scope proceeding before Commerce.

opposition to allowing Plaintiff to amend its pleading, there is no reason to dismiss

Plaintiff's claim or to require the amendment of the pleadings to determine that the Court

has jurisdiction over Plaintiff's claim under § 1581(i).

The court reviews an action brought under 28 U.S.C. § 1581(i) under the same

standards as provided under § 706 of the Administrative Procedure Act ("APA"), as

amended.  See 28 U.S.C. § 2640(e) (2012).  Under the statute,

> [t]he reviewing court shall--
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings and conclusions
>     found to be--
>
>> (C) in excess of statutory jurisdiction, authority, or limitations, or short
>>     of statutory right.

5 U.S.C. § 706(2)(A), (C).  Under the arbitrary and capricious standard, courts consider

whether the agency "'entirely failed to consider an important aspect of the problem,

offered an explanation for its decision that runs counter to the evidence before the agency,

or [the decision] is so implausible that it could not be ascribed to a difference in view or

the product of agency expertise.'"  Alabama Aircraft Indus., Inc. v. United States, 586 F.3d

1372, 1376 (Fed. Cir. 2009) (quoting Motor Vehicle Ass'n v. State Farm Mut. Auto. Ins.

Co., 463 U.S. 29, 43 (1983)).

## DISCUSSION

### I. Commerce Reasonably Determined that Sunpreme's Imported Modules Are In-Scope

Sunpreme argues that Commerce's determination that Sunpreme's cells are

dispositively in-scope merchandise based upon the plain language of the Orders and the

criteria under 19 C.F.R. § 351.225(k)(1) is contrary to law and unsupported by substantial

evidence for several reasons.  First, Sunpreme argues that Commerce's definition of

CSPV cells is not supported by the plain language of the Orders or the (k)(1) sources.

See Sunpreme Br. 8–17.  Sunpreme also argues Commerce lacked substantial evidence

to conclude that Sunpreme's imported modules are composed of CSPV cells as that term

is used in the scope language.  See Sunpreme Br. 17–23.  Second, Sunpreme claims

that Commerce's determination that the cells in Sunpreme's imported merchandise are

more than 20 μm thick is not supported by substantial evidence.  Id. at 23.  Third,

Sunpreme contends that Commerce's interpretation of the term "p/n junction formed by

any means" is contrary to law and that Commerce unreasonably concluded that the p/i/n

junction in Sunpreme's cells is a p/n junction formed by any means.  See id. 24–32.

Fourth, Sunpreme contests Commerce's interpretation of the term thin film photovoltaic

products and Commerce's determination that Sunpreme's imported merchandise is not

covered by the language in the Orders excluding thin film photovoltaic products.  Id. at

32–40.  After briefly reviewing the legal framework for Commerce's interpretation of scope

language, the court discusses each of Sunpreme's challenges to Commerce's scope

determination in turn.

### A.  Legal Framework

The language of an antidumping or countervailing duty order dictates its scope.

See Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1097 (Fed. Cir. 2002) (citing

Ericsson GE Mobile Commc'ns, Inc. v. United States, 60 F.3d 778, 782 (Fed Cir. 1995)).

Commerce's regulations provide that, where Commerce issues scope rulings to clarify

the scope of an ambiguous order with respect  to particular products, in addition to the

scope language, Commerce will take into account  descriptions of the merchandise

contained in: (1) the petition; (2) the initial investigation; (3) and past determinations by

Commerce, including prior scope determinations (collectively "(k)(1) sources"). 19 C.F.R.

§ 351.225(k)(1) (2015).[9]   When the (k)(1) sources are not dispositive, Commerce will

further consider:

> (i)   The physical characteristics of the product;
> (ii)  The expectations of the ultimate purchasers;
> (iii) The ultimate use of the product;
> (iv)  The channels of trade in which the product is sold; and
> (v)   The manner in which the product is advertised and displayed.

19 C.F.R. § 351.225(k)(2) (collectively "(k)(2) sources").

Commerce has broad authority "to interpret and clarify its antidumping duty orders."

Ericsson GE Mobile, 60 F.3d at 782 (citing Smith Corona Corp. v. United States, 915

F.2d 683, 686 (Fed. Cir. 1990)), as corrected on reh'g (Sept. 1, 1995)); see also King

Supply Co., LLC v. United States, 674 3d 1343, 1348 (Fed. Cir. 2012) (stating that

Commerce is entitled to substantial deference with regard to interpretations of its own

antidumping orders). However, Commerce may not interpret an order "so as to change

the scope of that order, nor can Commerce interpret an order in a manner contrary to its

terms."   Eckstrom Indus., Inc. v. United States, 254 F.3d 1068, 1072 (Fed. Cir. 2001)

(citing Wheatland Tube Co. v. United States, 161 F.3d 1365, 1370 (Fed. Cir. 1998)).

Furthermore, "[s]cope orders may be interpreted as including subject merchandise

only if they contain language that specifically includes the subject merchandise or may

be reasonably interpreted to include it."   Duferco, 296 F.3d at 1089. Although the petition

and the investigation proceedings may aid in Commerce's interpretation of the final

---

[9] Further citations to the Code of Federal Regulations are to the 2015 edition.

order, the order itself "reflects the decision that has been made  as to which merchandise

is within the final scope of the investigation and is subject to the  order." Id. at 1096.

Therefore, to the extent Commerce determines that any terms of the Orders are

ambiguous, Commerce must interpret the relevant language in the Orders to determine

whether it includes the merchandise at issue.  The scope language of the Orders at issue

provides:

> The merchandise covered by this order is [CSPV] cells, and modules, laminates and panels, consisting of [CSPV] cells, whether or not partially or fully assembled into other products, including but not limited to, modules, laminates, panels and building integrated materials.
> This order covers [CSPV] cells of thickness equal to or greater than 20 [μm], having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.
> . . .
> Excluded from the scope of this order are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS).

CVD Order, 77 Fed. Reg. at 73,017; ADD Order, 77 Fed. Reg. at 73,018.

After considering the plain language of the Orders, Commerce determined that the

scope language calls upon it to consider whether Sunpreme's products: "(1) are CSPV

cells, (2) are at least 20 micrometers [("μm")] thick, (3) contain a p/n junction [formed by

any means], and (4) are excluded thin film products."  Final Scope Ruling at 13.

## B.  Sunpreme's Solar Modules Consist of CSPV Cells

Sunpreme contends that Commerce's interpretation of the term CSPV cells

unreasonably expands the scope beyond the definition of that term as used in the Orders.

Sunpreme Br. 10–15.   Further, Sunpreme claims that Commerce's definition is

unsupported by either the plain language of the orders or the sources enumerated in 19 C.F.R. § 351.225(k)(1).  Id. at 15–23.  Defendant responds that Commerce reasonably relied upon the Triex Scope Ruling to interpret the term CSPV cells.  Def.'s Resp. Pl.'s Rule 56.2 Mot. J. Upon Agency R. 13–19, Mar. 1, 2017, ECF No. 88 ("Def.'s Resp. Br."). In addition, Defendant argues that Commerce properly determined that the cells in Sunpreme's solar modules meet the definition of CSPV cells.  Id. at 19–21.  For the reasons that follow, Commerce acted in accordance with law by interpreting the term "CSPV cells" based on the plain language of the Orders and the (k)(1) sources. Commerce's determination that Sunpreme's cells meet Commerce's definition is also supported by substantial evidence.

The Orders describe the subject merchandise as CSPV cells and "modules . . . consisting of CSPV cells, whether or not partially or fully assembled into other products, including, but not limited to modules," see CVD Order, 77 Fed Reg. 73,017, ADD Order, 77 Fed. Reg. 73,018, but the term CSPV cell is not defined in the Orders.  Commerce determined that the term "CSPV cell" requires that the cell rely on crystalline silicon to generate electricity even where other materials, such as amorphous silicon or other metal oxides, are present in the cell.  Final Scope Ruling 13.  That interpretation is reasonable because the petition, a (k)(1) source, states that CSPV cells contain crystalline silicon, see Final Scope Ruling at 13.  Further, Commerce relied upon the Triex Scope Ruling, also a (k)(1) source, which defines a CSPV cell as a cell that relies on crystalline silicon

to generate electricity.[10]   Final Scope Ruling at 13 (citing Triex Scope Ruling at 30).

Commerce also reasonably determined that Sunpreme's cells meet the definition of CSPV

by crediting Sunpreme's characterization of the crystalline silicon substrate in its product

as serving a primary role (i.e., the primary solar absorber), which Commerce found shows

that the wafer is an active component in the generation of electricity.[11]  See id. at 14 (citing

---

[10] In the Triex Scope Ruling, Commerce concluded that neither the plain meaning of the scope language nor the (k)(1) sources is dispositive of whether solar cells that have characteristics typically associated with both CSPV cells and thin film cells are subject to the Orders.  Triex Scope Ruling at 31.  However, Commerce found that the physical characteristics, consumer expectations and channels of trade and distribution are largely the same for both CSPV cells and for the Triex cells.  See Triex Scope Ruling at 36–38.  Specifically, Commerce notes that the crystalline silicon wafers in both CSPV and the Triex products are physically processed (i.e., doped) "to create a charge that, in turn, forms part of the electrical-field-generating junction."  Id. at 37.  Commerce makes clear that the function of the crystalline silicon wafer in the Triex cell is to "generate energy when struck by sunlight."  See id. at 30.  Here, Commerce determined that the functionality of the doped crystalline silicon substrate in the Sunpreme cells is materially identical to the functionality of the crystalline silicon component in Triex Cells in that Sunpreme acknowledged that the doped crystalline silicon substrates serve a primary role (i.e., the primary solar absorber) in its bifacial solar product.  See Final Scope Ruling at 14.  Sunpreme claims that Commerce does not substantiate its assertion that Sunpreme acknowledged that the substrates in Sunpreme's cells serve a primary role (i.e., the primary solar absorber), but the record contains several statements attributable to Sunpreme that acknowledge that the substrate in its cells serves as the primary solar absorber.  See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from The People's Republic of China: Sunpreme Inc.'s Submission of Comments Regarding the Silevo Final Scope Ruling at 27, CVD PD 72, bar code 348960-01 (July 5, 2016) (stating that "[i]n Sunpreme's cells the role of the wafer substrate is primarily to provide a light absorbing material and a stable mechanical/thermal interface for the amorphous silicon cells.")).  Therefore, whether or not Commerce may have referenced material that, as Sunpreme claims, is attributable to a journalist and not to Sunpreme, see Oral Arg. at 00:54:09–00:54:37, June 15, 2017, ECF No. 103, there is record evidence to support Commerce's finding that Sunpreme acknowledged the role of the substrate in its cells as absorbing sunlight.

[11] Sunpreme argues that nothing in the record supports Commerce's conclusion that the crystalline silicon substrate in the Sunpreme cells is actively involved in electricity generation.  Sunpreme Br. 19.  In support of this argument, Sunpreme attaches great significance to a laboratory analysis submitted with its scope application finding that the crystalline silicon wafer in its cells does not interact with the thin film layers, which Sunpreme argues demonstrates that the crystalline silicon wafer does not itself perform the role of converting sunlight to electricity.  See id.  Sunpreme offers no reason why Commerce could not reasonably conclude that the crystalline

(footnote continued)

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from The

People's Republic of China: Sunpreme Inc.'s Submission of Comments Regarding the

Silevo Final Scope Ruling at 14, 27–28, AD PD 66, bar code 348958-01 (July 5, 2016);

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from The

People's Republic of China: Sunpreme Inc.'s Submission of Comments Regarding the

Silevo Final Scope Ruling at 14, 27–28, CVD PD 72, bar code 348960-01 (July 5, 2016)

(collectively "Sunpreme Comments on Triex Scope Ruling" (stating that the raw wafer in

Sunpreme's cells have a positive or negative orientation that is inherent in the wafer

production process, and "the role of the wafer substrate is primarily a light absorbing

material and a stable mechanical/thermal interface for the amorphous silicon cells").[12]

---

silicon substrate is actively involved in electricity generation on the basis that the crystalline silicon substrate is the primary solar absorber without determining the substrate interacts with the thin film layers.  Without any such evidence, Commerce's determination that the crystalline silicon wafer in Sunpreme's cells is actively involved in electricity generation is supported by substantial evidence. Nothing inherent in the term CSPV cell or in the (k)(1) sources suggests that the crystalline silicon component must be capable of generating energy on its own.

[12] Sunpreme argues that Commerce's determination that Sunpreme's wafers are an active component in the production of electricity relies upon the notion that Sunpreme acknowledged its wafers are doped in that they are processed to impart an electrical charge.  See Sunpreme Br. 21.  Sunpreme claims that Commerce incorrectly defines the word "doped" (i.e., processed or active in the generation of electricity) in Sunpreme's statement, and, further, that the definition used by Commerce is inconsistent with the use of the word "doped" in the Petition and other investigation documents.  Sunpreme Br. 21.  Sunpreme cites the petition supplement, which defines a "dopant" as "a chemical element (impurity) added in small amounts to an otherwise pure semiconductor material to modify the electrical properties of the material."  Id. (citing id. at Ex. 1). Sunpreme's admission that is critical to Commerce's determination is that the crystalline silicon substrate in Sunpreme's cells is the primary solar absorber, not that the substrate has a positive or negative charge.  See Final Scope Ruling at 14 (stating that Commerce cannot ignore Sunpreme's acknowledgments that the substrates serve a primary role in absorbing sunlight and, therefore, are active components).  Sunpreme admits that the crystalline wafer in its cells absorb sunlight.  Sunpreme Br. 22.

(footnote continued)

Commerce determined that the function of the crystalline silicon substrate in the cells

making up Sunpreme's modules is similar to that of the crystalline silicon substrate in the

Triex cells in that the substrate in Sunpreme's cells is involved in the absorption of sunlight

for conversion to electricity.  Final Scope Ruling at 14.  Commerce's interpretation of the

ambiguous term CSPV cell therefore relies on the language in the Orders, and (k)(1)

sources, the petition and the Triex Scope Ruling.  Therefore Commerce's interpretation is

in accordance with law.

Furthermore, Sunpreme points to no evidence either detracting from Commerce's

findings regarding the function of the crystalline silicon substrate in its cells or

distinguishing that function from the function of the crystalline silicon component in the

---

Defendant explains that Commerce understands the term "doped" to be broad enough to encompass the meaning used by Sunpreme (i.e., either negatively or positively charged) and to mean the component is "processed or active in electricity generation," which Commerce incorporated from the Triex Scope Ruling, see Triex Scope Ruling at 16, 30, 33).  Oral Arg. at 01:14:50–01:15:15, June 15, 2017, ECF No. 103 ("Oral Arg.").  Defendant further argues that these definitions are not contradictory despite the fact that Commerce's use of the term is broader than the definition cited by Sunpreme.  Id. at 01:16:03–01:16:15.  The court agrees that these definitions of the term "doped" are not logically inconsistent.

Moreover, Defendant points out that the term "dope" is not part of the scope language.  See Oral Arg. 01:16:30–01:16:33.  Further, Defendant states that Commerce frequently clarifies the sense in which Commerce uses the term "doped" throughout the Triex Scope Ruling by parenthetically clarifying the sense of the term "doped" it is using in each portion of its analysis.  Id. at 01:15:15–01:15:28; see also Triex Scope Ruling at 16–17 (referring to "'dope' (i.e., either negatively or positively charge) the silicon"), 30 (clarifying the meaning of "slightly doped" as "(i.e., processed) and perform[ing] the critical energy-generating function in the operation of the cell."), 33 (clarifying that the use of the term "doped" by stating that "a product containing a doped (i.e., active) crystalline silicon component does not de facto override the significance of that crystalline silicon component"); Final Scope Ruling 14 (using the term doped to refer to the "absorption of sunlight for conversion to electricity" in the sense that Sunpreme's cells rely upon crystalline silicon for electricity generation), 17 (stating that Sunpreme's product contains a doped (i.e., active) crystalline silicon wafer).

Triex cells.[13]  Commerce's determination that Sunpreme's cells meet the definition of a

CSPV cell is therefore supported by substantial evidence.

Sunpreme raises numerous arguments challenging the support in the scope

language and (k)(1) sources for Commerce's interpretation of the term CSPV cell.  All are

unpersuasive.  First, Sunpreme argues that the International Trade Commission's ("ITC")

description of a CSPV cell requires that the crystalline silicon component of a CSPV cell

be able to function independently as a solar cell because the ITC report describes the

crystalline silicon in a CSPV cell as performing the function of converting sunlight into

electricity.  Sunpreme Br. 16–17.  Further, Sunpreme claims that nothing in the ITC's report

indicates that the function of converting sunlight into electricity is shared with any other

components in a CSPV cell.  See id. (citing Request for a Scope Ruling on Solar Modules

with Bi-Facial Thin Film Cells at Ex. 9 at 5, AD PD 1–6, bar codes 3417556-01–6 (Nov.

18, 2015); Request for a Scope Ruling on Solar Modules with Bi-Facial Thin Film Cells at

---

[13] Supreme argues that Commerce's finding that its cells rely upon crystalline silicon to generate electricity is belied by the fact that the patent on the record uses a substrate of metallurgical-grade crystalline silicon, which is never used in CSPV cells.  Sunpreme Br. 20–21.  Sunpreme claims that the petition and the International Trade Commission's injury determination states that CSPV cells use only solar-grade silicon with ultra-high purity over 99.9999%.  Id. at 21 (citing Request for a Scope Ruling on Solar Modules with Bi-Facial Thin Film Cells at Ex. 9 at I-16, AD PD 1–6, bar codes 3417556-01–6 (Nov. 18, 2015); Request for a Scope Ruling on Solar Modules with Bi-Facial Thin Film Cells at Ex. 9 at I-16, CVD PD 1–6, bar codes 3417582-01–06 (Nov. 16, 2015) (collectively "ITC Injury Determination")).  Sunpreme claims that the fact that its design can function with metallurgical-grade crystalline silicon instead of solar-grade crystalline silicon undermines Commerce's conclusion that its cells rely on the crystalline silicon to generate electricity.  Sunpreme Br. 21; see also Oral Arg. 00:47:21–00:47:59, June 15, 2017, ECF No. 103.  Commerce's determination acknowledges that there is conflicting evidence on the record regarding the role of the wafer in Sunpreme's cells, but Commerce ultimately credits Sunpreme's own statements about the role of the silicon substrate in its cells (i.e., the primary solar absorber) over other conflicting evidence.  Final Scope Ruling at 14.  Sunpreme's argument asks the court to reweigh the evidence as to what extent Sunpreme's cells rely on crystalline silicon to generate electricity.  The court declines to do so.

Ex. 9 at 5, CVD PD 1–6, bar codes 3417582-01–06 (Nov. 16, 2015) (collectively "ITC Injury Determination") (stating that "CSPV cells use either monocrystalline silicon or multicrystalline silicon to convert sunlight into electricity")).  However, the language of the Orders controls the scope.  See Duferco, 296 F.3d at 1089.  Sunpreme points to no language in the Orders indicating that the crystalline silicon component of a CSPV cell must be able to function independently as a solar cell before being incorporated into a photovoltaic product or that the crystalline silicon must be capable of converting sunlight into electricity on its own.  Moreover, the notion that the ITC description does not reference that the function may be shared between the crystalline silicon component of a CSPV cell and some other component does not indicate that the ITC meant to exclude products where the electricity generating function is shared between the crystalline silicon component and other parts of the cell.  See ITC Injury Determination at 5.  Therefore, Commerce reasonably relied upon the petition and the Triex Scope Ruling, both (k)(1) sources, to interpret the term CSPV cell to include a product containing crystalline silicon that is an active component in electricity generation even where that function may be shared with other parts of the cell.  See Final Scope Ruling at 13–14.

Sunpreme also argues that Commerce's definition of a CSPV cell as a photovoltaic cell that relies upon crystalline silicon to generate electricity is contrary to law because Commerce's definition is inconsistent with other (k)(1) sources, including the petition and the investigations of Commerce and the ITC injury determination.[14]  Sunpreme Br. 10.

---

[14] Sunpreme specifically claims that the petition and the Commerce and ITC investigations define CSPV cells by the presence of a p/n junction and not by the cells' reliance upon crystalline silicon. See id. 10–13.

Sunpreme contends that Commerce's definition allows cells containing only a crystalline silicon wafer without a p/n junction to be considered CSPV cells without support in the plain language of the orders or in the relevant (k)(1) sources.  See id.  Sunpreme's narrower understanding of a CSPV cell requires a specific type of p/n junction that is formed within the CSPV cell.  See id. at 12–14.  However, as discussed more fully below, the term p/n junction is not defined in the Orders.  Commerce's definition of a CSPV cell does require the presence of a p/n junction, albeit not of the specific structure advocated by Sunpreme.  See Final Scope Ruling at 15–16.  Commerce relied upon the plain language of the Orders, which references "a p/n junction formed by any means" and the Triex Scope Ruling, a (k)(1) source, to conclude that a p/n junction formed by any means includes architectures in which the positively charged and negatively charged layers are in close proximity.  See Final Scope Ruling at 15; see also Triex Scope Ruling at 17–18 (reasoning that the purpose of the crystalline silicon wafer serves the same purpose in both a traditional CSPV cell and the Triex cell: electricity generation between positively and negatively doped regions of the cell).  Therefore, Commerce's definition of a CSPV is consistent with the plain language of the orders as well as the (k)(1) sources, which require subject merchandise to contain "a p/n junction formed by any means."

Next, Sunpreme argues that Commerce's definition of a CSPV cell, which requires only that a CSPV cell rely upon crystalline silicon to generate electricity, is inconsistent with the ITC's definition of the term "CSPV cell."  Id. at 12 (citing ITC Injury Determination at 5 (stating that "CSPV cells use either monocrystalline silicon or multicrystalline silicon to convert sunlight into electricity")).  Sunpreme specifically argues that "the precise

wording of the ITC's description undermines Commerce's definition . . . [a]s 'rely' is a vague term . . . [which permits] a layer of crystalline silicon [to] do less than 'convert sunlight into electricity' but still meet the definition of a CSPV cell." Id. The language indicating that CSPVs "use crystalline silicon" may be vague, but it is not inconsistent with Commerce's interpretation of the function of crystalline silicon in a CSPV cell. Nothing in the ITC's description cited by Sunpreme requires the crystalline silicon to perform the role of converting sunlight into electricity without the aid of other cell components. See ITC Injury Determination at 5.

Sunpreme claims that Commerce's definition of a CSPV cell is not based upon an interpretation of ambiguous language in the Orders, but rather is based upon statements made in the Triex proceeding that do not apply to Sunpreme's product. Sunpreme 18–19. However, Commerce relies upon its interpretation of the ambiguous term CSPV cell from the Triex Scope Ruling because it determined that the function of the crystalline silicon component in the Triex cells and the cells making up Sunpreme's modules is similar. See Final Scope Ruling at 14 (citing Triex Scope Ruling at 30). Commerce based its conclusion that the crystalline silicon substrate in the Sunpreme cells is involved in electricity generation on Sunpreme's own statement that the crystalline silicon substrate in the cells making up its modules contains doped crystalline silicon substrates that enhance the function of the amorphous silicon layers and act as the primary solar absorbers. See id. Sunpreme fails to point to evidence on the record undermining Commerce's conclusion that the crystalline silicon substrate in its cells is involved in electricity generation. Therefore, Commerce's reasonably adopted the interpretation of

the ambiguous term CSPV cell from the Triex ruling and determined that unrefuted record evidence supports the notion that Sunpreme's cells meet that definition.

Sunpreme also insists that Commerce's failure to consider the factors under 19 C.F.R. § 351.225(k)(2) without addressing the unique factual records developed for each product renders Commerce's determination unsupported by substantial evidence. Sunpreme Br. 31–32. However, Commerce's regulations provide that it will analyze the criteria in 19 C.F.R. § 351.225(k)(2) only where the (k)(1) criteria are not dispositive. See 19 C.F.R. § 351.225(k)(2). To be dispositive, the (k)(1) criteria must definitively answer the scope question. Sango Int'l, L.P. v. United States, 484 F.3d 1371, 1379 (Fed. Cir. 2007) (citations omitted). Here, Commerce reasonably concluded that the language of the petition and the interpretations of the scope language in the Triex Scope Ruling sufficiently clarify the general definition of a CSPV cell to allow Commerce to reasonably conclude that Sunpreme's merchandise meets that definition. See Final Scope Ruling at 13–14. Commerce's interpretation of a CSPV cell in the Triex Scope Ruling relied upon the general functionality of the crystalline silicon component in the Triex cell, and Sunpreme points to no record evidence undermining that the crystalline silicon component of its cells performs a similar function in the generation of electricity. Therefore, Commerce's determination that Sunpreme's products meets the definition of a CSPV cell, as clarified by the (k)(1) sources, is supported by substantial evidence.

## C. Sunpreme's Cells Are At Least 20 μm Thick

Sunpreme argues that Commerce's determination that Sunpreme's cells are at least 20 μm thick is unsupported by substantial evidence because the crystalline silicon substrate component of Sunpreme's cell should be excluded from the measurement of

the product's thickness.  Sunpreme Br. 23.  Instead, Sunpreme contends that Commerce

should be measuring the amorphous silicon layers, which it argues are far thinner than

20 μm, deposited onto the crystalline silicon substrate.  See id. at 23–24.  Defendant

responds that Commerce properly included the crystalline silicon component in its

measurement of Sunpreme's cells because Commerce reasonably determined that the

scope language calls upon it to measure the thickness of the active components of the

cell.  Def.'s Resp. Br. 26.  For the reasons that follow, Commerce's determination that

Sunpreme's cells meet the 20 μm thickness threshold is supported by substantial

evidence.

        The plain language of the Orders does not explicitly state what portion of a CSPV

cell must exceed the thickness threshold provided in the scope language.  Rather, the

Orders provide that the CSPV cell must be at least 20 μm thick.  CVD Order, 77 Fed.

Reg. 73,017, ADD Order, 77 Fed. Reg. 73,018.  Commerce concluded that the crystalline

silicon component must be included in measuring the thickness of a CSPV cell because

the crystalline silicon component plays an essential role in electricity generation.  See

Final Scope Ruling at 14.  It is reasonably discernible that Commerce concluded that the

scope language calling upon it to consider the thickness of a CSPV cell includes all

functional components of the cell that play a role in generating electricity from solar

energy.  See id.  That interpretation is reasonable, given the plain language of the Orders.

        Sunpreme contends that Commerce should have excluded the crystalline silicon

substrate component when measuring the thickness of Sunpreme's cells.  See Sunpreme

Br. 24.  Sunpreme relies upon the argument that the crystalline silicon substrate is not

part of the active part of the cell.[15]  See id.  Commerce supported its determination that

the crystalline silicon substrate in Sunpreme's cells is an active and essential component

in generating electricity by noting that the substrate is the primary solar absorber.  Final

Scope Ruling 14.  Sunpreme admits that the substrate is the primary solar absorber.

Sunpreme Br. 22, 25.  Commerce also rejected Sunpreme's argument that the crystalline

silicon component is not part of the electricity-generating component of the cell.  See Final

Scope Ruling at 16.  Commerce concluded that the idea that an electricity-generating

junction could be created, either between a positively charged and an intrinsic (i.e.,

neutral charged) layer or between a negatively charged and an intrinsic layer, is illogical

because "both a positive 'p' layer and a negative 'n' layer are required in order to generate

an electrical field."  Id.  Sunpreme points to no record evidence undermining Commerce's

conclusion that "the [crystalline silicon] wafer is a necessary connection between the

positive and negative regions of Sunpreme's cells."[16]  Id.  Therefore, Sunpreme's

contention that the crystalline silicon substrate is not part of the active part of the cell fails.

### D.  Sunpreme's Cells Contain a "P/N Junction Formed By Any Means"

Sunpreme argues that Commerce unreasonably interpreted the term "p/n junction

formed by any means" to include the p/i/n junction in Sunpreme's cells.  Sunpreme Br.

24–32.  Defendant responds that substantial evidence supports Commerce's

determination that the scope language "p/n junction formed by any means" includes a

---

[15] Sunpreme claims that the p/i/n junction in its cells is formed in the thin film layers of doped and undoped amorphous silicon, which are the active component of its cells.  See Sunpreme Br. 24.

[16] In fact, Sunpreme concedes that a junction between positively charged and negatively charged components of the cell "is essential to the creation of an electrical field."  See Sunpreme Br. 25.

p/i/n junction and other arrangements of positive, negative, and intrinsic/neutral layers within a photovoltaic cell like those contained in Sunpreme's cells.  Def.'s Resp. Br. 21–25.  For the reasons that follow, Commerce's determination that Sunpreme's cells contain a "p/n junction formed by any means" is supported by substantial evidence.

The Orders do not define the phrase "p/n junction formed by any means." Commerce interpreted the phrase "p/n junction formed by any means" to include structures in which the positively charged and negatively charged layers are not adjacent or within the crystalline silicon wafer.  Final Scope Ruling at 15.  That interpretation is reasonable and consistent with the scope language and the (k)(1) sources because it gives significance to the entire phrase "formed by any means," while referencing pre-initiation versions of scope language proposed by the petitioner that indicate alternative architectures were meant to be included in the scope of the Orders.[17]  See Final Scope Ruling at 15.

Specifically, Commerce referenced its determination in the Triex Scope Ruling that a "p/i/n junction and other arrangements of positive, negative, and intrinsic/neutral layers within a photovoltaic cell can be understood to be types of p/n junctions within the meaning of the scope of the *Orders*."  Final Scope Ruling at 15 (citing Triex Scope Ruling at 18).  In the Triex Scope Ruling, Commerce attached great significance to the phrase "formed by any means," which Commerce concluded indicates that the specific

---

[17] Specifically, Commerce underscores that pre-initiation versions of scope language submitted by petitioner included a more exhaustive description of possible means of forming a p/n junctions, including heterojunctions and p/n junctions formed by means other than diffusion.  Final Scope Ruling at 16.  Commerce notes that such descriptions were omitted from the final scope language because Commerce believed such itemization was unnecessary.  Id.

architecture of p/n junction formation is irrelevant to determining the meaning of the phrase "p/n junction."  See Triex Scope Ruling at 17.  To reach this conclusion, Commerce first analyzed the structural distinctions between a p/n junction and the p/i/n junction contained in the Triex cells.  See id.  Commerce noted that some type of junction between a positively charged and negatively charged region of a cell is essential to the creation of an electrical field, and Commerce concluded that the intrinsic (i.e., inert) layer simply connects the positively charged layers with the negatively charged layers and extends the electrical field over an additional layer of material.  Id. at 18.  Second, Commerce analyzed the function or purpose of a junction where the positively charged and negatively charged layers are not in direct contact.  See id.  Commerce concluded that the function of a junction where the p-layer and n-layer is in direct contact is the same as a junction where those layers are separated by an intrinsic layer because the intrinsic layer simply extends the electric field over the crystalline silicon wafer region.[18]  See id.

---

[18] Sunpreme contends that the fact that p/n and p/i/n junctions are recognized in the scientific community as distinct photovoltaic structures belies Commerce's interpretation that a p/i/n junction can be understood as a type of p/n junction for purposes of the Orders.  See Sunpreme Br. 26–27. Sunpreme cites the glossary attached the petition in which the Department of Energy defines the two types of junctions separately as additional evidence that a p/n junction involves a structure in which the p and n layers must be adjacent.  See id. at 27 (citing Sunpreme Br. Ex. 1 at Ex. Gen-Supp 4).

However, Commerce explicitly acknowledged that presence on the record of materials published by other government agencies such as the Department of Energy.  See Final Scope Ruling at 16.  In response to these sources, Commerce indicated that its determination is based on a textual interpretation of the scope language and the relevant (k)(1) sources rather than the assertions of experts that were not involved in drafting the scope language.  Id.  Although the definition of p/n junction cited by Sunpreme references a p-type layer and an n-type layer, see Sunpreme Br. 27, the definition cited by Sunpreme does not define a p/n junction to the exclusion of a structure in which those layers are separated by an intrinsic layer.  See Sunpreme Br. Ex. 1 at Ex. Gen-Supp 4 (defining a "p/n" junction as "a semiconductor photovoltaic device structure in

(footnote continued)

Sunpreme argues that Commerce's interpretation is contrary to law because the phrase "formed by any means" refers to structures where the positive and negative layers within the cell are adjacent but are formed by different methods, not to junctions of any type or located anywhere in the cell.  Sunpreme Br. 26.  However, it is reasonably discernible that Commerce discounted an interpretation of the phrase "formed by any means" that limits the phrase to apply to a structure in which the positive and negative layers are formed within the cell because Commerce found that pre-initiation versions of scope language indicate that petitioner intended to include structures where the p/n junction is formed outside of the cell.[19]  Final Scope Ruling at 15 (citing Triex Scope Ruling at 13, 31).  Moreover, Commerce notes that the scope language describes the junction without reference to any specific method of junction formation because Commerce did not believe itemization was necessary.  See id.; see also Triex Scope Ruling at 17 (stating that the Orders describe covered merchandise without reference to the method of junction formation (i.e., either diffusion or deposition), which Commerce concluded undercuts the

---

which the junction is formed between the p-type layer and an n-type layer.").  Moreover, the fact that a p/i/n junction structure is described separately as a structure in which layers of an intrinsic semiconductor between the p-type and n-type semiconductors, see Sunpreme Br. Ex. 1 at Ex. Gen-Supp 4, does not necessarily indicate that a p/i/n junction is not a type of p/n junction for purposes of the Order.  Therefore, the record documents cited by Sunpreme do not render Commerce's interpretation unreasonable.

[19] Specifically, Commerce states that it found the pre-initiation versions of the scope language indicate that SolarWorld intended to include heterojunctions and p/n junctions formed by means other than diffusion.  Final Scope Ruling at 15.  It is reasonably discernible that Commerce viewed heterojunctions and p/n junctions formed by means other than diffusion as including structures where the p/n junction is formed outside of the crystalline silicon component cell.  See Triex Scope Ruling at 17.

argument that the orders require a p/n junction to be formed within a CSPV cell).[20]  It is

also reasonably discernible that Commerce ruled out the notion that the phrase "formed

by any means" limits a CSPV cell to only a structure in which the positive and negative

layers are adjacent because Commerce concluded in the Triex Scope Ruling that the

presence or absence of layers between the positively charged and negatively charged

layers does not change the function or purpose of the junction to generate an electrical

field, but rather simply extend that electrical field over a wider region of the cell.  See Triex

Scope Ruling at 18. Even if Sunpreme's alternative reading that the phrase "p/n junction

formed by any means" implies that the positively charged and negatively charged layers

are adjacent, is reasonable, Commerce has explained why its broader interpretation of

the phrase "p/n junction formed by any means" is reasonable and supported by the scope

language and the (k)(1) sources.

Sunpreme next argues that Commerce's determination that Sunpreme's products

meet the definition of "p/n junction formed by any means" provided in the Triex Scope

Ruling is not supported by substantial evidence because Sunpreme's cells are physically

---

[20] Sunpreme argues that Commerce unreasonably concluded that reducing the list of many forms of junctions in early drafts of proposed scope language to a single junction in the final scope language did not narrow the scope language.  Sunpreme Br. 30.  But Commerce reasonably explained its logic that the removal of the reference to various types of junctions in the scope language sought to avoid limiting potential products.  See Triex Scope Ruling at 18.  Further, Commerce found the absence of language explicitly including a p/i/n junction not dispositive because the scope language does not define a p/n junction by excluding certain structures.  See Triex Scope Ruling at 18.  Where scope is defined by excluding items that are explicitly defined, it is reasonable to assume that removing such exclusions would broaden the scope.  On the other hand, where, as here, Commerce supported its explanation for why it reads the term p/n junction broadly and the scope language enumerates no specific architectures, it is reasonable for Commerce to conclude that the removal of specific descriptions of structures was not meant to narrow the scope.

distinguishable from the Triex products.  Sunpreme Br. 30.  Specifically, Sunpreme cites

the lack of the silicon dioxide insulator between the crystalline silicon wafer and the

intrinsic and p-type and n-type amorphous thin film layers in its cells, which Sunpreme

notes distinguish its cells from the Triex cells.  Sunpreme Br. 31.  However, Commerce

explained that the presence or absence of silicon dioxide insulating layers is irrelevant to

its analysis regarding p/n junction formation in the Triex cell because "the function or

nature of a p/n junction in a CSPV [cell] is unchanged by the addition of a layer of [silicon

dioxide] or other insulating material."[21]   Final Scope Ruling at 15 (citing Triex Scope

Ruling at 32, 39 (internal quotations omitted)).  Commerce justified its determination that

a p/i/n junction is a type of p/n junction in the Triex Scope Ruling by drawing attention to

the inclusion of different types of junction architectures in early drafts of scope language

included in the petitions.  Triex Scope Ruling at 31.  Commerce further justified its

determination by noting the absence of record evidence indicating that certain types of

junctions characterized by a positive region and a negative region generating an electrical

field were meant to be excluded.  Triex Scope Ruling at 31–32. Sunpreme points to no

record evidence undermining the notion that the junctions in its cells have a materially

similar function to the junctions in the Triex cells.[22]

---

[21] The absence of a layer of silicon dioxide in Sunpreme's cells does not affect the applicability of Commerce's logic from the Triex Scope Ruling.  Commerce grounded its determination that a p/n junction is a broad term meant to capture multiple structures that are all, by nature, characterized by a positive region and a negative region generating an electrical field in the function of the p/n junction, not in the actual composition of the p/n junction. See Triex Scope Ruling at 32.

[22] Sunpreme argues that the record illustrates that its cells contain a p/i/n junction that is chemically and functionally different from the junction in the Triex cells.  Sunpreme Br. 30–31.

(footnote continued)

### E.  Sunpreme's Cells are Not Excluded Thin-Film Photovoltaic Products

Sunpreme argues that Commerce's interpretation of the language excluding "thin film photovoltaic products produced from amorphous silicon" is unreasonably narrow and unsupported by the petition or the (k)(1) sources.  Sunpreme Br. 32–40.  Defendant responds that Commerce reasonably determined that the petition and the Triex Scope Ruling, both (k)(1) sources, indicate that cells containing a crystalline silicon component that contributes to their photovoltaic function are not thin film photovoltaic products as that term is defined in the Orders even if such products contain thin films produced from amorphous silicon.  Def.'s Resp. Br. 28–29.  For the reasons that follow, Commerce's definition of thin film products is in accordance with law.

The Orders do not define the term "thin film photovoltaic products produced from amorphous silicon."  The scope language is silent as to the substrate of excluded thin film products.  See CVD Order, 77 Fed. Reg. 73,017, ADD Order, 77 Fed. Reg. 73,018.  The

---

However, the specific differences that Sunpreme highlights are not functional differences, but rather structural differences.  Specifically, Sunpreme argues that the positively charged layers and negatively charged layers are not adjacent and that the junction is formed inside the amorphous silicon thin film layers, not in the silicon substrate.  Id. at 31.  As already discussed, Commerce reasonably concluded that the term "p/n junction formed by any means" includes structures where these layers are not adjacent.  See Final Scope Ruling at 15–16.  As to the notion that two separate junctions are formed in the thin film layers, not the substrate, Commerce discounted this claim because Commerce found that it is illogical to reason that an electricity generating junction could be formed between a negatively charged layer and an uncharged layer or between a positively charged layer and an uncharged layer because both a positive and negative layer are necessary to generate an electrical field.  See id. at 16.  Sunpreme acknowledges that each amorphous silicon p-layer and n-layer in its bifacial cells is immediately adjacent to a layer of undoped intrinsic amorphous silicon thin film, see Sunpreme Br. 31, which is sandwiched between a naturally slightly doped silicon substrate.  Id. at 22.  Sunpreme does not question Commerce's understanding that a positive and negative layer are necessary to generate an electrical field within the cell.  Moreover, Commerce determined that Sunpreme's claim is directly contradicted by Sunpreme's earlier description of its products as containing a p/i/n junction similar to the junction contained in the Triex cells.  Id. at 16.

term "thin film photovoltaic products" is not unambiguously equivalent to any photovoltaic

product with a thin film.  Therefore, Commerce reasonably consulted the (k)(1) sources

to define the term "thin film photovoltaic products."  Commerce cited the petition, a (k)(1)

source, which explicitly states that "thin film photovoltaic products" do not use crystalline

silicon to conclude that a product that uses crystalline silicon to generate electricity,[23]

such as the Sunpreme cell, is not a thin film photovoltaic product.  Final Scope Ruling at

17 (citing Request for a Scope Ruling on Solar Modules with Bi-Facial Thin Film Cells at

Ex. 6 at 16–17, AD PD 1–6, bar codes 3417556-01–6 (Nov. 18, 2015); Request for a

Scope Ruling on Solar Modules with Bi-Facial Thin Film Cells at Ex. 6 at 16–17, CVD PD

1–6, bar codes 3417582-01–06 (Nov. 16, 2015) (collectively "Petitions")).  Citing the Triex

Scope Ruling, another (k)(1) source, Commerce determined that including all products

containing amorphous silicon in the thin film exclusion would create an easy means of

circumventing the Orders.  Id. (citing Triex Scope Ruling at 33).  That interpretation is

---

[23] Sunpreme argues that Commerce's interpretation that a thin film product cannot contain any crystalline silicon conflicts with statements by the ITC describing certain thin film products as using a combination of amorphous silicon and micro-crystalline silicon.  Sunpreme Br. 34 (citing ITC Final Determination at I-20).  However, Commerce's definition of thin film photovoltaic products assessed the presence of a thin film in relation to other substrates of the product.  See Final Scope Ruling at 17.  Commerce did not base its determination that Sunpreme's modules are not thin film photovoltaic products solely upon the presence of crystalline silicon, but rather upon the role the crystalline silicon wafer played in converting solar energy into electricity.  See id. Commerce references the fact that the statement in the petitions to the effect that thin film products do not use crystalline silicon to explain its determination that "the presence of an amorphous silicon thin film element in a product containing a doped (*i.e.*, active) crystalline silicon wafer . . . does not *de facto* override the significance of the crystalline silicon component."  Id. The plain language of the Orders is silent with regard to what substrates may be used in thin film photovoltaic products.  See CVD Order, 77 Fed. Reg. 73,017, ADD Order, 77 Fed. Reg. 73,018. Commerce reasonably looked to the Triex Scope Ruling and the petitions to determine whether function of the crystalline silicon substrate in Sunpreme's products matched the function of crystalline silicon within a CSPV cell.

reasonable because it gives meaning to all of the language of the Orders and is based

on the (k)(1) sources, which state that the thin film photovoltaic products exclusion does

not apply to products in which a crystalline silicon component contributes to their ability

to convert sunlight into electricity.[24]

Commerce adequately addressed Sunpreme's arguments regarding the meaning

of the thin film exclusion.   Commerce rejected Sunpreme's arguments that the scope

language and the (k)(1) sources, including the petition and the ITC investigation broadly

exclude products that contain thin films of amorphous silicon. See Final Scope Ruling at

17 (concluding that the mere presence of thin films of amorphous silicon is insufficient to

place a product within the thin film photovoltaic product exclusion); see also Sunpreme

Br. 33–38.   Specifically, Sunpreme points to the petition's explicit statement that "[t]hin

film technologies are not covered by the Petitions."   Sunpreme Br. 33 (citing Request for

a Scope Ruling on Solar Modules with Bi-Facial Thin Film Cells at Ex. 6 at 16–17, AD PD

1–6, bar codes 3417556-01–6 (Nov. 18, 2015); Request for a Scope Ruling on Solar

Modules with Bi-Facial Thin Film Cells at Ex. 6 at 16–17, CVD PD 1–6, bar codes

3417582-01–06 (Nov. 16, 2015) at 16–17 (collectively "Petition")).   Likewise, Commerce

---

[24] In the Triex Scope Ruling, Commerce noted that nothing in the scope language explicitly addresses what substrates may be included in thin film photovoltaic products. Triex Scope Ruling at 33.   Commerce cites the ITC's investigation, which it found "provides an illustrative list of substrates that were contemplated in [the agency's] discussion of thin film products: 'glass, stainless steel, [and] plastic.'" Id. at 34.   Commerce also notes that the petitions state that thin film products do not use crystalline silicon. Id.   However, Commerce did not define thin film photovoltaic products merely by excluding any products containing a crystalline silicon substrate. See id.   Rather, Commerce read the petition's suggestion that thin film photovoltaic products should not contain crystalline silicon together with the function of the crystalline silicon substrate in the Triex cells to determine that the Orders meant to exclude products containing crystalline silicon that is active and essential to the generation of electricity. See id.

considered and rejected Sunpreme's arguments that the petition's use of the term "thin

film technologies" indicates petitioners intended that the definition of thin film photovoltaic

products in the scope language should be expansive.  See id.  Sunpreme points to no

definition of the term "technologies" in the petition, and the term "thin film photovoltaic

products" is not defined in the scope language of the Orders.  See CVD Order, 77 Fed.

Reg. 73,017, ADD Order, 77 Fed. Reg. 73,018.  Commerce reasonably concluded, based

upon an interpretation of the term thin film photovoltaic products derived from the petition,

that the mere presence of thin films of amorphous silicon is insufficient to place a product

within the exclusion because the petitions explicitly indicate that thin film products do not

use crystalline silicon.[25]  Final Scope Ruling at 17.

Finally, Commerce did not find the International Standard IEC certification of

Sunpreme's modules as a thin film product dispositive in defining the term "thin film

photovoltaic products."  See Final Scope Ruling at 17 (acknowledging that the IEC

certifications are cited in the petition but concluding they are not dispositive as to whether

---

[25] At oral argument, Sunpreme emphasized that the Orders contain an exclusion for "thin film photovoltaic products," which is a broader term than thin film cells. Oral Arg. 00:05:48–00:05;59, ECF No. 103 ("Oral Arg."). Sunpreme further underscored that its imported merchandise consists of bifacial solar modules, not photovoltaic cells. Id. at 00:06:00–00:06:12; see also Reply Br. Pl. Sunpreme, Inc. 6–10, Mar. 29, 2017, ECF No. 97. Sunpreme argues that it is unreasonable for Commerce to rely upon its determination in the Triex Scope Ruling interpreting thin film photovoltaic products on the basis of the characteristics of the Triex cells and apply that interpretation to Sunpreme's modules. Reply Br. Pl. Sunpreme, Inc. 7, Mar. 29, 2017, ECF No. 97. However, Commerce's analysis in interpreting the term thin film photovoltaic products relies upon the function of crystalline silicon within the photovoltaic cells that compose the modules. Final Scope Ruling at 17. Sunpreme points to no scope language or (k)(1) source indicating that it is unreasonable to conclude that a module consisting of cells in which crystalline silicon contributes to the electricity generating function would not be considered a thin film photovoltaic product where the cells making up that module would. Therefore, Commerce reasonably applied its interpretation of thin film photovoltaic products from the Triex Scope Ruling to determine whether Sunpreme's solar modules fall within the thin film photovoltaic products exclusion.

a product is a thin film photovoltaic product); see also Sunpreme Br. 35.  Specifically,

Sunpreme underscores that the petition clearly referenced industry standard (IEC 61646)

in relation to the category of thin film products, and Sunpreme contends the petition

evidences a desire to exclude all products meeting this industry standard from the scope

of the Orders.  Sunpreme Br. 35.  However, the scope language itself does not reference

any industry standard in defining thin film photovoltaic products.  See CVD Order, 77 Fed.

Reg. 73,017, ADD Order, 77 Fed. Reg. 73,018.  Commerce specifically acknowledges

that the IEC certifications are cited in the petition, a (k)(1) source, but Commerce

concluded that they are not relied upon as dispositive authorities because these

certifications were not relied upon in the initial investigations to define thin film

photovoltaic products and the standards are not referenced in the scope language itself.[26]

Final Scope Ruling at 17 (citing Triex Scope Ruling at 31).  Sunpreme points to no

language in the petitions or any (k)(1) source that makes it unreasonable for Commerce

to conclude that the certifications are non-dispositive.[27]

---

[26] In the Triex Scope Ruling, Commerce notes that the Triex cells have characteristics typically associated with CSPV products and thin film photovoltaic products.  Triex Scope Ruling at 31. Sunpreme does not argue that its products do not possess characteristics typically associated with both CSPV cells and thin film cells.  Commerce further supports its determination that the certifications are not dispositive by referencing that the Orders do not explicitly exclude "hybrid" cells that contain amorphous silicon thin film but are otherwise subject to the Orders.  Id.

[27] Although Commerce stated that Sunpreme's products are certified as both CSPV products and thin film products, Commerce cites its determination in the Triex Scope Ruling that certifications are non-dispositive in regard to whether or not an imported project is subject to the scope of the Orders.  Final Scope Ruling 17.  In the Triex Scope Ruling, Commerce points out that the scope language does not explicitly exclude "hybrid" products, or products that meet both classifications. Triex Scope Ruling at 31.  Therefore, Commerce concluded, based on the plain language of the Orders that the certifications received by a product are not dispositive as to whether a product is a thin film photovoltaic product.  Id.

(footnote continued)

Sunpreme points out that its products are only certified according the IEC standard for thin film products.    Sunpreme Br. 35–36.    Commerce's reasoning that those certifications are non-dispositive is supported by the plain language of the Orders as well as the (k)(1) sources is not undermined by the fact that Sunpreme's products received

---

Sunpreme first argues that Commerce's finding that Sunpreme's products are certified as CSPV modules is incorrect and unsupported by the record.  Sunpreme Br. 35–36.  Commerce does find that evidence on the record "suggests that Sunpreme's bifacial solar products are also certified as CSPV products by the IEC."  Final Scope Ruling at 16.  Commerce also states that Sunpreme has not refuted that certifications applicable to CSPV products are not applicable to the specific product that is the subject of this scope proceeding.  Id.  It is unclear whether Commerce bases its findings on the weighing of the conflicting evidence.  However, this finding is not material to Commerce's interpretation of the term "thin film photovoltaic products" or to Commerce's determination that Sunpreme's products are not covered by the exclusionary language in the Orders because Commerce determined that IEC certifications are merely informative, but not dispositive as to whether or not products are CSPV products or thin film photovoltaic products for purposes of the scope of the Orders.  Final Scope Ruling at 17.

Second, Sunpreme cites testimony by petitioner before the ITC that hybrid cells containing crystalline silicon and amorphous silicon are not meant to be covered by the petitions as detracting from Commerce's determination that a thin film photovoltaic product does not use crystalline silicon.  See Sunpreme Br. 38–39 (citing Sunpreme Scope Ruling Request at Ex. 13).  However, Commerce excluded products containing crystalline silicon that is active in the cell's generation of electricity, not based merely on the presence of crystalline silicon within the cell.  Id.  The statement relied upon by Sunpreme says nothing about the function of the crystalline silicon in the hybrid cell discussed in testimony before the ITC.

Third, Sunpreme references this same testimony to claim that it is unreasonable to read the scope language as applying to cells containing both crystalline silicon and amorphous silicon because it demonstrates that the ITC made no material injury finding with regard to such "hybrid" products.  See id. at 40.  Although Commerce acknowledged that the testimony may indicate that the ITC may not have made an injury determination with respect to products containing both amorphous silicon and crystalline silicon, Commerce determined that the ITC's investigation provides little guidance as to the proper interpretation of the thin film exclusion because the record before the ITC does not reflect the full universe of processes used to produce either thin film cells or CSPV cells..  See id. at 13.  Commerce's conclusion as to the relative insignificance of the ITC's findings is reasonable, and the court declines to reweigh the evidence.

only thin film certification.[28]  Therefore, Commerce's determination is not undermined by

the fact that its products only received thin film certification.

## II.  Commerce's Liquidation Instructions Were Contrary to Law

Sunpreme objects that Commerce's instructions to CBP to continue suspension of

liquidation and to collect cash deposits with respect to entries prior to the initiation of the

instant scope inquiry were contrary to law.  Sunpreme Br. 41.  Defendant responds that

Commerce's instructions are in accordance with law because Commerce's regulations

---

[28] Sunpreme argues that Commerce's interpretation that the certification is non-dispositive is contradicted by a statement in the petition to the effect that:

> Notably, International Standard IEC 61215 applies only to crystalline silicon products; a separate standard –IEC 61646–applies to thin-film products, further demonstrating the distinctions between these two products.

Reply Br. Pl. Sunpreme, Inc. 19–20, Mar. 29, 2017, ECF No. 97 ("Sunpreme Reply Br.") (citing Sunpreme Inc.'s Submission of Factual Information at Ex. 1, Attach 1, AD PD 32–48, bar codes 3481963-01–05 and 3481978-01–12 (June 27, 2016); Sunpreme Inc.'s Submission of Factual Information at Ex. 1, Attach 1, CVD PD 38–54, bar codes 3481991-01–17 (June 27, 2016)). However, whereas the petition states that the CSPV standard applies only to CSPV products, it does not state that the thin-film product standard applies only to thin film products.  See Sunpreme Inc.'s Submission of Factual Information at Ex. 1, Attach 1, AD PD 32–48, bar codes 3481963-01–05 and 3481978-01–12 (June 27, 2016); Sunpreme Inc.'s Submission of Factual Information at Ex. 1, Attach 1, CVD PD 38–54, bar codes 3481991-01–17 (June 27, 2016).  Therefore, the petition language cited by Sunpreme does not render Commerce's interpretation unreasonable.

Sunpreme further argues that Commerce's decision to treat the statement in the petition to the effect that thin film photovoltaic products do not contain crystalline silicon as dispositive of whether a product falls within the thin film exclusion while treating the petition's statements about certifications as merely informative is arbitrary.  Sunpreme Reply Br. 20.  As already, discussed Commerce did not treat the presence of crystalline silicon as dispositive of whether a product is a thin film photovoltaic product, but rather looked to how the crystalline silicon functioned within the cell to determine if the thin film of amorphous silicon caused the product to fall within the exclusion.  See Final Scope Ruling at 17.  Moreover, the petition language pertaining to the certifications explicitly recognizes the possibility that the IEC 61646 standard could apply to a CSPV product.  See Sunpreme Inc.'s Submission of Factual Information at Ex. 1, Attach 1, AD PD 32–48, bar codes 3481963-01–05 and 3481978-01–12 (June 27, 2016); Sunpreme Inc.'s Submission of Factual Information at Ex. 1, Attach 1, CVD PD 38–54, bar codes 3481991-01–17 (June 27, 2016) (stating that the IEC 61646 applies to thin-film products, but not only to thin-film photovoltaic products).

permit the suspension of liquidation to continue, regardless of when a scope inquiry was initiated." See Def.'s Resp. Br. 36.  For the reasons that follow, Commerce's liquidation instructions directing CBP to suspend liquidation on entries prior to initiation of the scope inquiry are contrary to law.

Commerce's regulations presume suspension of liquidation is lawful.  See 19 C.F.R. §§ 351.225(l)(1), (3).  Commerce's regulation cannot reasonably be read to permit an ultra vires suspension of liquidation to continue.  When Commerce conducts a scope inquiry,

> and the product in question is already subject to suspension of liquidation, that suspension of liquidation will be continued, pending a preliminary or final scope ruling, at the cash deposit rate that would apply if the product were ruled to be included within the scope of the order.

19 C.F.R. § 351.225(l)(1).  Once Commerce issues a final scope ruling to the effect that the product is included within the scope of the order,

> Any suspension of liquidation under paragraph (l)(1) . . . of this section will continue.  Where there has been no suspension of liquidation, [Commerce] will instruct [CBP] to suspend liquidation and to require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry of the product entered, or withdrawn from the warehouse, for consumption on or after the date of initiation of the scope inquiry.

19 C.F.R. § 351.225(l)(3).  In AMS Assocs., Inc. v. United States, 737 F.3d 1338 (Fed. Cir. 2013), the Court of Appeals for the Federal Circuit held that, where an unclear order renders a product not subject to an existing order and Commerce clarifies ambiguous scope language to determine that the merchandise is subject to the antidumping order, "the suspension of liquidation and imposition of antidumping cash deposits may not be retroactive but can only take effect 'on or after the date of the initiation of the scope inquiry.'" AMS Assocs., Inc. v. United States, 737 F.3d 1338, 1344 (Fed. Cir. 2013) ("AMS

II") (emphasis in original) (citing identical language in 19 C.F.R. § 351.225(I)(2), as the language quoted above in 19 C.F.R. § 351.225(I)(3)).   Although in <u>AMS II</u>, Commerce issued corrected liquidation instructions explicitly instructing CBP to suspend liquidation retroactively, <u>see AMS II</u>, 737 F.3d at 1341, the Court of Appeals' holding barring retroactive application of Commerce's findings did not depend upon Commerce taking such additional action.   <u>See id.</u> at 1344.

Here, CBP could not determine whether Plaintiff's merchandise was within the scope of the Orders based solely upon the words of the Orders and the physical characteristics of the merchandise.   Therefore, Plaintiff's goods were outside of the scope of the Orders until Commerce interpreted the ambiguous scope language to the effect that Plaintiff's products were subject to the Orders because CBP lacks the authority to interpret ambiguous scope language.   <u>See</u> <u>Xerox Corp. v. United States</u>, 289 F.3d 792, 794–95 (Fed. Cir. 2002); <u>see also</u> Final Scope Ruling at 18.   Since Sunpreme's products were not subject to the Orders at the time Commerce initiated its scope inquiry on December 30, 2015, <u>see</u> Final Scope Ruling at 2, Commerce's regulations only permitted Commerce to suspend liquidation and collect cash deposits prospectively from the date of initiation of the scope inquiry.   19 C.F.R. § 351.225(I)(3); <u>AMS II</u>, 737 F.3d at 1344.

Defendant points to no authority, other than CBP's ultra vires determination to require Plaintiff to enter its merchandise as subject to the Orders, for the collection of cash deposits and suspension of liquidation on Plaintiff's entries.   Defendant and Defendant-Intervenor argue that, unlike in <u>AMS II</u>, here Sunpreme's entries were already suspended prior to the date Commerce initiated its scope inquiry.   Def.'s Resp. Br. 36;

SolarWorld Americas Inc.'s Resp. Pl.'s Mem. Supp. Rule 56.2 Mot. J. Agency R. 31, Mar.

2, 2017, ECF No. 91 ("SolarWorld Resp. Br.").   Therefore, Defendant and Defendant-

Intervenor interpret 19 C.F.R. §§ 351.225(l)(1) and (3) to permit the suspension of

liquidation to continue and the collection of cash deposits on all entries for which

liquidation was suspended.   Def.'s Resp. Br. 36 (citing 19 C.F.R. §§ 351.225(l)(1), (3));

SolarWorld Resp. Br. 31–32. (citing 19 C.F.R. §§ 351.225(l)(1), (3)).      However,

Commerce's regulation cannot reasonably be interpreted to permit the suspension of

liquidation and collection of cash deposits to continue where they resulted from an ultra

vires interpretation of the scope language.   Such an interpretation is unreasonable

because it would validate CBP's ultra vires interpretation and permit the circumvention of

Commerce's regulations by allowing CBP to require a party to enter goods as subject to

the Orders before Commerce has interpreted ambiguous scope language.   Nor can either

portion of Commerce's regulation reasonably be interpreted to permit Commerce to

require cash deposits prior to the date of initiation of the scope inquiry merely because

CBP suspended liquidation before that date without authority to do so.   CBP's purported

suspension of liquidation was void *ab initio*.   Sunpreme Inc. v. United States, 40 CIT __,

__, 190 F. Supp. 3d 1185, 1204 (2016) ("Sunpreme III").   Commerce could not extend the

suspension of liquidation on entries that were not appropriately administratively

suspended.   See id.

        Defendant worries about the policy implications that may result from interpreting

the statutory and regulatory framework as barring Commerce from ordering the

suspension of liquidation or collection of cash deposits on goods that may be subject to

the scope of the orders prior to the initiation of a scope inquiry.  Def.'s Resp. Br. 39.

Defendant argues that tying the ultimate duty assessment to whether, and the date on

which, Commerce initiates a scope inquiry may shield merchandise entered prior to the

date of initiation from antidumping or countervailing duty liability altogether.  Id.  Where

merchandise is prima facie covered the words of the order, Commerce may order the

suspension of liquidation and collection of cash deposits even in a case where an importer

claims there is ambiguity in an order.  However, where the unambiguous language of an

order and factual determinations alone do not allow CBP to determine that a good falls

within an order, the good must be considered outside of the scope until Commerce

interprets the order and clarifies that the merchandise should be included in the context

of a scope determination.  See Xerox, 289 F.3d at 794–95 (stating that Commerce should

decide whether an ambiguous antidumping order covers particular products in the first

instance).  In the event Commerce initiates a scope proceeding because the goods were

not prima facie covered by the order, Commerce's regulations bar it from suspending

liquidation or collecting cash deposits prior to the initiation of a scope inquiry.  See 19

C.F.R. §§ 351.225(l)(1), (3).  Commerce cannot purport to continue a suspension of

liquidation that was itself without authority.  The court must interpret the statutory and

regulatory scheme as is.  The court leaves it to Congress and Commerce to address the

policy drawback identified here.

## CONCLUSION

The court sustains Commerce's determination to the effect that Sunpreme's

merchandise is subject to the Orders.  However, Commerce's issuance of liquidation

10

Court No. 16-00171                                           Page 47

instructions directing CBP to suspend liquidation on entries prior to initiation of the scope

inquiry is contrary to law.  As a result, there was no valid suspension of liquidation for

Commerce to continue under 19 C.F.R. §§ 351.225(l)(1) and (3).  Therefore, Commerce

lacks authority to suspend liquidation or order the collection of cash deposits on entries

prior to the initiation of the scope inquiry.  Any suspension of liquidation must not cover

entries entered prior to December 30, 2015.  All cash deposits collected on entries prior

to the initiation of the scope inquiry must be returned to Plaintiff.  Judgment will enter

accordingly.


 /s/ Claire R. Kelly
Claire R. Kelly, Judge


Dated: August 29, 2017
       New York, New York